## UNITED STATES *v.* DIEKELMAN.

1. Unless treaty stipulations provide otherwise, a merchant vessel of one country visiting the ports of another for the purpose of trade, is, so long as she remains, subject to the laws which govern them.

2. Where, in time of war, a foreign vessel, availing herself of a proclamation of the President of May 12, 1862, entered the port of New Orleans, the blockade of which was not removed, but only relaxed in the interests of commerce, she thereby assented to the conditions imposed by such proclamation that she should not take out goods contraband of war, nor depart until cleared by the collector of customs according to law.

3. As New Orleans was then governed by martial law, a subject of a foreign power entering that port with his vessel under the special license of the proclamation became entitled to the same rights and privileges accorded under the same circumstances to loyal citizens of the United States. Restrictions placed upon them operated equally upon him.

4. Money, silver-plate, and bullion, when destined for hostile use or for the purchase of hostile supplies, are contraband of war. In this case, the determination of the question whether such articles, part of the outward-bound cargo of the vessel, were contraband, devolved upon the commanding general at New Orleans. Believing them to be so, he, in discharge of his duty, ordered them to be removed from her, and her clearance to be withheld until his order should be complied with.

5. Where the detention of the vessel in port was caused by her resistance to the orders of the properly constituted authorities whom she was bound to obey, she preferring such detention to a clearance upon the conditions imposed, — *Held,* that her owner, a subject of Prussia, is not " entitled to any damages " against the United States, under the law of nations or the treaty with that power. 8 Stat. 384.

APPEAL from the Court of Claims.

*Mr. Assistant Attorney-General Edwin B. Smith* for the appellant.

*Mr. J. D. McPherson, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This suit was brought in the Court of Claims under the au-

thority of a joint resolution of both Houses of Congress, passed May 4, 1870, as follows : —

" That the claim of E. Diekelman, a subject of the King of Prussia, for damages for an alleged detention of the ship " Essex " by the military authorities of the United States at New Orleans, in the month of September, 1862, be and is hereby referred to the Court of Claims for its decision in accordance with law, and to award such damages as may be just in the premises, if he may be found to be entitled to any damages."

Before this resolution was passed, the matter of the claim had been the subject of diplomatic correspondence between the governments of the United States and Prussia.

The following article, originally adopted in the treaty of peace between the United States and Prussia, concluded July 11, 1799 (8 Stat. 168), and revived by the treaty concluded May 1, 1828 (8 Stat. 384), was in force when the acts complained of occurred, to wit : —

" Art. XIII. And in the same case, if one of the contracting parties, being engaged in war with any other power, to prevent all the difficulties and misunderstandings that usually arise respecting merchandise of contraband, such as arms, ammunition, and military stores of every kind, no such articles carried in the vessels, or by the subjects or citizens of either party, to the enemies of the other, shall be deemed contraband so as to induce confiscation or condemnation, and a loss of property to individuals. Nevertheless, it shall be lawful to stop such vessels and articles, and to detain them for such length of time as the captors may think necessary to prevent the inconvenience or damage that might ensue from their proceeding ; paying, however, a reasonable compensation for the loss such arrest shall occasion to the proprietors ; and it shall further be allowed to use in the service of the captors the whole or any part of the military stores so detained, paying the owners the full value of the same, to be ascertained by the current price at the place of its destination. But in the case supposed of a vessel stopped for articles of contraband, if the master of the vessel stopped will deliver out the goods supposed to be of contraband nature, he shall be admitted to do it, and the vessel shall not, in that case, be carried into any port, nor further detained, but shall be allowed to proceed on her voyage."

When the "Essex" visited New Orleans, the United States were engaged in the war of the rebellion. The port of that city was, at the very commencement of the war, placed under blockade, and closed against trade and commercial intercourse; but, on the 12th of May, 1862, the President, having become satisfied that the blockade might "be safely relaxed with advantage to the interests of commerce," issued his proclamation, to the effect that from and after June 1 "commercial intercourse, . . . except as to persons, things, and information contraband of war," might "be carried on subject to the laws of the United States, and to the limitations, and in pursuance of the regulations . . . prescribed by the Secretary of the Treasury," and appended to the proclamation. These regulations, so far as they are applicable to the present case, are as follows : —

"1. To vessels clearing from foreign ports and destined to . . . New Orleans, . . . licenses will be granted by consuls of the United States upon satisfactory evidence that the vessels so licensed will convey no persons, property, or information contraband of war either to or from the said ports; which licenses shall be exhibited to the collector of the port to which said vessels may be respectively bound, immediately on arrival, and, if required, to any officer in charge of the blockade; and on leaving either of said ports every vessel will be required to have a clearance from the collector of the customs according to law, showing no violation of the conditions of the license." 12 Stat. 1264.

The "Essex" sailed from Liverpool for New Orleans June 19, 1862, and arrived Aug. 24. New Orleans was then in possession of the military forces of the United States, with General Butler in command. The city was practically in a state of siege by land, but open by sea, and was under martial law.

The commanding general was expressly enjoined by the government of the United States to take measures that no supplies went out of the port which could afford aid to the rebellion; and, pursuant to this injunction, he issued orders in respect to the exportation of money, goods, or property, on account of any person known to be friendly to the Confederacy, and directed the custom-house officers to inform him whenever an attempt was made to send any thing out which might be the subject of investigation in that behalf.

In the early part of September, 1862, General Butler, being still in command, was informed that a large quantity of clothing had been bought in Belgium on account of the Confederate government, and was lying at Matamoras awaiting delivery, because that government had failed to get the means they expected from New Orleans to pay for it; and that another shipment, amounting to a half million more, was delayed in Belgium from coming forward, because of the non-payment of the first shipment.  He was also informed that it was expected the first payment would go forward through the agency of some foreign consuls; and this information afterwards proved to be correct.

He was also informed early in September by the customhouse officers, that large quantities of silver-plate and bullion were being shipped on the "Essex," then loading for a foreign port, by persons, one of whom had declared himself an enemy of the United States, and none of whom would enroll themselves as friends; and he thereupon gave directions that the specified articles should be detained, and their exportation not allowed until further orders.

On the 15th September, the loading of the vessel having been completed, the master applied to the collector of the port for his clearance, which was refused in consequence of the orders of General Butler, but without any reasons being assigned by the collector.  The next day, he was informed, however, that his ship would not be cleared unless certain specified articles which she had on board were taken out and landed. Much correspondence ensued between General Butler and the Prussian consul at New Orleans in reference to the clearance, in which it was distinctly stated by General Butler that the clearance would not be granted until the specified goods were landed, and that it would be granted as soon as this should be done.  Almost daily interviews took place between the master of the vessel and the collector, in which the same statements were made by the collector.  The master refused to land the cargo, except upon the return of his bills of lading.  Some of these bills were returned, and the property surrendered to the shipper.  In another case, the shipper gave an order upon the master for his goods, and they were taken away by force.  At a very early stage in the proceeding, the master and the Prussian con-

sul were informed that the objection to the shipment of the articles complained of was that they were contraband.

A part only of the goods having been taken out of the vessel, a clearance was granted her on the 6th of October, and she was permitted to leave the port and commence her voyage.

Upon this state of facts, the Court of Claims gave judgment for Diekelman, from which the United States took an appeal.

One nation treats with the citizens of another only through their government. A sovereign cannot be sued in his own courts without his consent. His own dignity, as well as the dignity of the nation he represents, prevents his appearance to answer a suit against him in the courts of another sovereignty, except in performance of his obligations, by treaty or otherwise, voluntarily assumed. Hence, a citizen of one nation wronged by the conduct of another nation, must seek redress through his own government. His sovereign must assume the responsibility of presenting his claim, or it need not be considered. If this responsibility is assumed, the claim may be prosecuted as one nation proceeds against another, not by suit in the courts, as of right, but by diplomacy, or, if need be, by war. It rests with the sovereign against whom the demand is made to determine for himself what he will do in respect to it. He may pay or reject it; he may submit to arbitration, open his own courts to suit, or consent to be tried in the courts of another nation. All depends upon himself.

In this case, Diekelman, claiming to have been injured by the alleged wrongful conduct of the military forces of the United States, made his claim known to his government. It was taken into consideration, and became the subject of diplomatic correspondence between the two nations. Subsequently, Congress, by joint resolution, referred the matter to the Court of Claims " for its decision according to law." The courts of the United States were thus opened to Diekelman for this proceeding. In this way the United States have submitted to the Court of Claims, and through that court upon appeal to us, the determination of the question of their legal liability under all the circumstances of this case for the payment of damages to a citizen of Prussia upon a claim originally presented by his sovereign in his behalf. This requires us, as we think, to consider

the rights of the claimant under the treaty between the two governments, as well as under the general law of nations.   For all the purposes of its decision, the case is to be treated as one in which the government of Prussia is seeking to enforce the rights of one of its citizens against the United States in a suit at law, which the two governments have agreed might be instituted for that purpose.   We shall proceed upon that hypothesis.

1. As to the general law of nations.

The merchant vessels of one country visiting the ports of another for the purposes of trade subject themselves to the laws which govern the port they visit, so long as they remain; and this as well in war as in peace, unless it is otherwise provided by treaty.   *The Exchange* v. *McFadon,* 7 Cranch, 316. When the " Essex " sailed from Liverpool, the United States were engaged in war.   The proclamation under which she was permitted to visit New Orleans made it a condition of her entry that she should not take out goods contraband of war, and that she should not leave until cleared by the collector of customs according to law.   Previous to June 1 she was excluded altogether from the port by the blockade.   At that date the blockade was not removed, but relaxed only in the interests of commerce.   The war still remained paramount, and commercial intercourse subordinate only.   When the " Essex " availed herself of the proclamation and entered the port, she assented to the conditions imposed, and cannot complain if she was detained on account of the necessity of enforcing her obligations thus assumed.

The law by which the city and port were governed was martial law.   This ought to have been expected by Diekelman when he despatched his vessel from Liverpool.   The place had been wrested from the possession of the enemy only a few days before the issue of the proclamation, after a long and desperate struggle.   It was, in fact, a garrisoned city, held as an outpost of the Union army, and closely besieged by land.   So long as it remained in the possession of the insurgents, it was to them an important blockade-running point, and after its capture the inhabitants were largely in sympathy with the rebellion.   The situation was, therefore, one requiring the most active vigil-

ance on the part of the general in command. He was especially required to see that the relaxation of the blockade was not taken advantage of by the hostile inhabitants to promote the interests of the enemy. All this was matter of public notoriety; and Diekelman ought to have known, if he did not in fact know, that although the United States had to some extent opened the port in the interests of commerce, they kept it closed to the extent that was necessary for the vigorous prosecution of the war. When he entered the port, therefore, with his vessel, under the special license of the proclamation, he became entitled to all the rights and privileges that would have been accorded to a loyal citizen of the United States under the same circumstances, but no more. Such restrictions as were placed upon citizens, operated equally upon him. Citizens were governed by martial law. It was his duty to submit to the same authority.

Martial law is the law of military necessity in the actual presence of war. It is administered by the general of the army, and is in fact his will. Of necessity it is arbitrary; but it must be obeyed. New Orleans was at this time the theatre of the most active and important military operations. The civil authority was overthrown. General Butler, in command, was the military ruler. His will was law, and necessarily so. His first great duty was to maintain on land the blockade which had theretofore been kept up by sea. The partial opening of the port toward the sea, made it all the more important that he should bind close the military lines on the shore which he held.

To this law and this government the "Essex" subjected herself when she came into port. She went there for gain, and voluntarily assumed all the chances of the war into whose presence she came. By availing herself of the privileges granted by the proclamation, she, in effect, covenanted not to take out of the port "persons, things, or information contraband of war." What is contraband depends upon circumstances. Money and bullion do not necessarily partake of that character; but, when destined for hostile use or to procure hostile supplies, they do. Whether they are so or not, under the circumstances of a particular case, must be determined by some

one when a necessity for action occurs.  At New Orleans, when this transaction took place, this duty fell upon the general in command.  Military commanders must act to a great extent upon appearances.  As a rule, they have but little time to take and consider testimony before deciding.  Vigilance is the law of their duty.  The success of their operations depends to a great extent upon their watchfulness.

General Butler found on board this vessel articles which he had reasonable cause to believe, and did believe, were contraband, because intended for use to promote the rebellion.  It was his duty, therefore, under his express instructions, to see that the vessel was not cleared with these articles on board; and he gave orders accordingly.  It matters not now whether the property suspected was in fact contraband or not.  It is sufficient for us that he had reason to believe, and in fact did believe, it to be contraband.  No attempt has been made to show that he was not acting in good faith.  On the contrary, it is apparent, from the finding of the court below, that the existing facts brought to his knowledge were such as to require his prompt and vigorous action in the presence of the imminent danger with which he was surrounded.  Certainly enough is shown to make it necessary for this plaintiff to prove the innocent character of the property before he can call upon the United States to respond to him in damages for the conduct of their military commander, upon whose vigilance they relied for safety.

Believing, then, as General Butler did, that the property was contraband, it was his duty to order it out of the ship, and to withhold her clearance until his order was complied with.  He was under no obligation to return the bills of lading.  The vessel was bound not to take out any contraband cargo.  She took all the risks of this obligation when she assumed it, and should have protected herself in her contracts with shippers against the contingency of being required to unload after the goods were on board.  If she failed in this, the consequences are upon her, and not the United States.  She was operating in the face of war, the chances of which might involve her and her cargo in new complications.  She voluntarily assumed the risks of her hazardous enterprise, and must sustain the losses that follow.

Neither does it affect the case adversely to the United States that the property had gone on board without objection from the custom-house officers or the military authorities. It is not shown that its character was known to General Butler or the officers of the custom-house before it was loaded. The engagement of the vessel was not to leave until she had been cleared according to law, and that her clearance might be withheld until with reasonable diligence it could be ascertained that she had no contraband property on board. This is the legitimate effect of the provisions of the treasury regulations, entitling her to a license "upon satisfactory evidence" that she would "convey no persons, property, or information contraband of war, either to or from" the port; and requiring her not to leave until she had "a clearance from the collector of customs, according to law, showing no violation of the license." Her entry into the port was granted as a favor, not as a right, except upon the condition of assent to the terms imposed. If the collector of customs was to certify that the license she held had not been violated, it was his duty to inquire as to the facts before he made the certificate. Every opportunity for the prosecution of this inquiry must be given. Under the circumstances, the closest scrutiny was necessary. If, upon the examination preliminary to the clearance, prohibited articles were found on board, there could be no certificate such as was required, until their removal. It would then be for the vessel to determine whether she would remove the goods and take the clearance, or hold the goods and wait for some relaxation of the rules which detained her in port as long as she had them on board. General Butler only insisted upon her remaining until she removed the property. She elected to remain. There was no time when her clearance would not have been granted if the suspected articles were unloaded.

We are clearly of the opinion that there is no liability to this plaintiff resting upon the United States under the general law of nations.

2. As to the treaty.

The vessel was in port when the detention occurred. She had not broken ground, and had not commenced her voyage. She came into the waters of the United States while an im-

pending war was flagrant, under an agreement not to depart with contraband goods on board. The question is not whether she could have been stopped and detained after her voyage had been actually commenced, without compensation for the loss, but whether she could be kept from entering upon the voyage and detained by the United States within their own waters, held by force against a powerful rebellion, until she had complied with regulations adopted as a means of safety, and to the enforcement of which she had assented, in order to get there. In our opinion, no provision of the treaties in force between the two governments interferes with the right of the United States, under the general law of nations, to withhold a custom-house clearance as a means of enforcing port regulations.

Art. XIII. of the treaty of 1828 contemplates the establishment of blockades, and makes special provision for the government of the respective parties in case they exist. The vessels of one nation are bound to respect the blockades of the other. Clearly the United States had the right to exclude Prussian vessels, in common with those of all other nations, from their ports altogether, by establishing and maintaining a blockade while subduing a domestic insurrection. The right to exclude altogether necessarily carries with it the right of admitting through an existing blockade upon conditions, and of enforcing in an appropriate manner the performance of the conditions after admission has been obtained. It will not be contended that a condition which prohibits the taking out of contraband goods is unreasonable, or that its performance may not be enforced by refusing a clearance until it has been complied with. Neither, in the absence of treaty stipulations to the contrary, can it be considered unreasonable to require goods to be unloaded, if their contraband character is discovered after they have gone on board. In the existing treaties between the two governments there is no such stipulation to the contrary. In the treaty of 1799, Art. VI. is as follows: " That the vessels of either party, loading within the ports or jurisdiction of the other, may not be uselessly harassed or detained, it is agreed that all examinations of goods required by the laws shall be made before they are laden on board the vessel, and that there shall be no examination after." While other articles in the

treaty of 1799 were revived and kept in force by that of 1828, this was not. The conclusion is irresistible, that the high contracting parties were unwilling to continue bound by such a stipulation, and, therefore, omitted it from their new arrangement. It would seem to follow, that, under the existing treaty, the power of search and detention for improper practices continued, in time of peace even, until the clearance had been actually perfected and the vessel had entered on her voyage. If this be the rule in peace, how much more important is it in war for the prevention of the use of friendly vessels to aid the enemy.

Art. XIII. of the treaty of 1799, revived by that of 1828, evidently has reference to captures and detentions after a voyage has commenced, and not to detentions in port, to enforce port regulations. The vessel must be " stopped " in her voyage, not detained in port alone. There must be " captors; " and the vessel must be in a condition to be " carried into port " or detained from " proceeding " after she has been " stopped," before this article can become operative. Under its provisions the vessel " stopped " might " deliver out the goods supposed to be contraband of war, " and avoid further " detention." In this case there was no detention upon a voyage, but a refusal to grant a clearance from the port that the voyage might be commenced. The vessel was required to " deliver out the goods supposed to be contraband " before she could move out of the port. Her detention was not under the authority of the treaty, but in consequence of her resistance of the orders of the properly constituted port authorities, whom she was bound to obey. She preferred detention in port to a clearance on the conditions imposed. Clearly her case is not within the treaty. The United States, in detaining, used the right they had under the law of nations and their contract with the vessel, not one which, to use the language of the majority of the Court of Claims, they held under the treaty " by purchase " at a stipulated price.

As we view the case, the claimant is not " entitled to any damages " as against the United States, either under the treaty with Prussia or by the general law of nations.

*The judgment of the Court of Claims is, therefore, reversed, and the cause remanded with directions to dismiss the petition.*