Dratce, Oh. J.,
delivered the opinion of the court:
The principal question arising on the facts as found is, whether ihe proceeds of the cotton have, in contemplation of law, gone into the Treasury. If they have, the claimant is entitled to recover; otherwise, not.
The cotton did not go into the hands of any agent of the Treasury Department; and therefore it cannot be regularly traced in the ordinary way into the Treasury.
It did not go into the hands of a military officer, who disbursed the proceeds in paying the expenses of ordinary military operations, and was allowed by the department for his disbui’sements; in which case the proceeds would be held to have gone indirectly into the Treasury.
The cotton was sold by order of the commanding general of the Department of the Gulf, and the proceeds were expended for specific purposes designated by him, namely: 1. For expenses of organizing and equipping a body of colored troops, to be a part of the military forces of the United States; and 2. For the relief of the freedmen and the support of their schools.
As to disbursements, under the first head, there can be no question of the right of the commanding general to order them out of any money under the control of his quartermaster-general ; .and when the latter received credit by the accounting officers of the Treasury Department for those disbursements, the proceeds of the cotton were as effectually in the Treasury as if the identical money paid for the cotton had been carried there and laid in the vaults of the Treasurer.
But it may be questioned whether the same should be said of so much of the proceeds as were' disbursed under the second head, namely, the relief of the freedmen and the support of their schools. The decision of this point brings into view some *255 matters wliicli have not hitherto, so far as we can recall, become the subjects of judicial cognizance or remark.
As was said by the Supreme Court of the United States in Dickelman v. United States (92 U. S., 520), “Martial law is the law of military necessity in the actual presence of war. It is administered by the General of the Army, and is, in fact, his will. Of necessity it is arbitrary, but it must be obeyed.”' This was the only 'law which ruled the city of New Orleans for years after its capture by the Union forces on the 25th of April, 1862 ; and it extended over the surrounding region as rapidly as that region was brought under the power of the Union arms. It was the law which was in force and enforced when the transactions involved in this case took place.
In all history, perhaps, no commanding general of a conquering force has had so many questions of unusual and peculiar character to deal with and decide by his own will as the commanding general at New Orleans had. Among them was one entirely new, growing out of the proclamation issued by President Lincoln on the 1st of January, 1863, ordering and declaring that all persons held as slaves within the States and parts of States designated in that proclamation as “in rebellion against the United States” were on that day and thenceforward should be free, “and that the executive government of the United States, including the military and naval authorities thereof, Avould recognize and maintain the freedom of said persons”.
The result of this proclamation was to bring within the range of the military authorities in Louisiana an immense number of persons of the African race who had been slaves, but who claimed under the proclamation to have become and, in fact, when within the Union lines were, freedmen, whose freedom the military authorities were bound not only to recognize but maintain.
To provide and care for this numerous population, suddenly changed from slaves into freedmen, was one of the new questions presented to the commanding general of the Department of the Gulf, to be dealt with by him at his own will. They became, at the instant of the change, an important element in all his military plans and calculations, and necessarily in his military expenses. What should be done by them, with them, and for them, was to be, and necessarily had to be, determined by his will.
*256 Under these circumstances the commanding general of that Department ordered the proceeds of the cotton brought from Port Hudson, including that of claimant’s intestate, to be used, in part, for the relief of the freedmen and the support of their schools.
Were we authorized to review his action in this regard, we should have no difficulty in holding it fully justified by the circumstances of the time; but we have no such power. An authority exercised at his own will by a military commander, invested in a time of war with supreme military power, is not to be revised by any civil tribunal. That can be done by his military superior only.
In ordering the proceeds of the cotton in question to be used for the benefit of the freedmen and the support of their schools, he tiumed in that direction money which would otherwise, directly or indirectly, have gone into the Treasury. If he had not ordered it to be so used, he would have required money sent to him from the Treasury to be applied to that object. In either case he would have dealt with money of the government. Therefore, when he applied the proceeds of this cotton to that end, and the accounts of the disbursing officers, showing the money that came into their hands from the Port Hudson cotton, and its disbursement under his orders, were allowed and settled by the accounting officers of the Treasury, the matter was closed up, and the proceeds of the cotton of the claimant’s intestate were, in effect, in the Treasury, subject to any recovery which might afterwards be had here in favor of the intestate or her personal representative.
The judgment of the court is that the claimant recover the sum of $8,650.