## UNITED STATES v. GUARANTY TRUST CO. OF NEW YORK.

### No. 402.

Circuit Court of Appeals, Second Circuit.

Aug. 16, 1937.

Lamar Hardy, U. S. Atty., of New York City (Leon E. Spencer, Asst. U. S. Atty., of New York City, David E. Hudson, Sp. Asst. to the Atty. Gen., and Henry Munroe, Sp. Atty., and David McKibbin, 3d, Sp. Asst. to the U. S. Atty., both of New York City, of counsel), for the United States.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (John W. Davis, Ralph M. Carson, and J. Paschall Davis, all of New York City, of counsel), for appellee.

Before MANTON, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

This is an action at law by the United States to recover from Guaranty Trust Company of New York the alleged balance of a deposit account. The complaint alleges that on July 15, 1916, the Government of the State of Russia opened a deposit account with the defendant in New York; that on December 12, 1917, there remained in said account $4,976,722.78, and said sum was then, and still is, owing by the defendant, together with interest thereafter accrued; that on November 16, 1933, the Government of the State of Russia assigned all its right, title, and interest in said debt to the plaintiff; that payment thereof has been demanded by the plaintiff and refused by the defendant. Upon affidavits and depositions before answer, the defendant made a motion to dismiss the complaint under rule 107 of the Rules of Civil Prac-

tice of New York and the Conformity Act. 28 U.S.C.A. § 724. The ground of the motion was that the cause of action had accrued to the assignor more than six years prior to the assignment and, therefore, the remedy of the assignee was likewise barred by the state statute of limitations. Civil Practice Act N.Y. § 48. United States v. Buford, 3 Pet. 12, 29, 7 L.Ed. 585. Under the law of New York an unequivocal repudiation of liability by the bank would start the running of the statute as against a private litigant. Tillman v. Guaranty Trust Co., 253 N.Y. 295, 171 N.E. 61. The District Judge found that the defendant had unequivocally repudiated its liability as early as February 25, 1918. On that date the defendant closed the account, charging against it sums which were claimed to be owing to Guaranty Trust Company by the State of Russia as successor under nationalization decrees of banks in Russia whose assets had been confiscated. The District Judge also found that notice of such repudiation was received prior to June 30, 1922, by Ambassador Boris Bakhmeteff and by Mr. Serge Ughet, financial attaché and charge d'affaires, who at the time were recognized by our State Department as the accredited representatives of the State of Russia in this country. Accordingly, the defendant's motion was granted. From judgment dismissing the complaint upon the merits the plaintiff has appealed.

▮ The question whether a foreign sovereign is affected by a state statute of limitations is one upon which no direct authority has been found. It is, of course, settled law that a state statute of limitations cannot bar the United States. Davis v. Corona Coal Co., 265 U.S. 219, 44 S.Ct. 552, 68 L.Ed. 987. Whether a foreign sovereign might be barred was left open in French Republic v. Saratoga Vichy Spring Co., 191 U.S. 427, at page 437, 24 S.Ct. 145, 147, 48 L.Ed. 247, where Mr. Justice Brown remarked:

"It is said, however, that the doctrine of laches has no application to the neglect of the government to pursue trespassers up on its rights, and that the French Republic is entitled to the benefit of that rule. It is at least open to doubt whether the maxim nullum tempus, applicable to our own government, can be invoked in behalf of a foreign government suing in our courts. The doctrine is one of public policy, and is based upon the assumption that the officers of the government may be so busily en-

gaged in the ordinary affairs of state as to neglect a vindication of its interests in the courts. Whether this exemption can be set up by a foreign government in the prosecution of suits against our own citizens— in other words, whether the latter are not entitled to the benefit of the ordinary defenses at law—is a question which does not necessarily arise in this case, and as to which we are not called upon to express an opinion."

In United States v. Nashville, etc., R. Co., 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81, there is a dictum that the principle of public policy, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided, is "applicable to all governments alike." See, also, United States v. Thompson, 98 U.S. 486, 489, 490, 25 L.Ed. 194. On the other hand, in Lehigh Valley R. Co. v. State of Russia, 21 F.(2d) 396, 400 (C.C.A.2), this court referred to the duty of Mr. Ughet to continue the suits for the State of Russia and to avoid delays "which would give rise to the bar of limitation to sue." If Mr. Ughet had authority to continue a suit on behalf of the State of Russia, as we there held, it seems clear that he would have had authority to commence a suit on behalf of the State of Russia against Guaranty Trust Company after learning of its repudiation of liability on the deposit account. But it does not follow that his failure to do so for a period of six years would operate as a bar against the foreign sovereign. The statement on the subject of limitation in the Lehigh Valley Case was purely dictum.

▮ The defendant relies also upon Western Lunatic Asylum v. Miller, 29 W.Va. 326, 1 S.E. 740, 6 Am.St.Rep. 644, where it was held, on the assumption that the plaintiff and the Commonwealth of Virginia were one and the same, that the suit was barred by the statute of limitations of West Virginia. See, also, United States v. Brown, 247 N.Y. 211, 218, 160 N.E. 13; Commissioners of the Sinking Fund of Louisville v. Buckner, 48 F. 533, 536 (C.C.Ky.). It is argued that there can be no distinction between applying a limitation statute to another state of the Union and applying it to a foreign government, but we are not prepared to accept this conclusion in view of the complete power over international affairs which is vested in the national gov-

ernment. See United States v. Belmont, 57 S.Ct. 758, 761, 81 L.Ed. ——, where it is said that such power cannot be subjected to any curtailment or interference on the part of the several states. If a state Legislature should declare that a particular foreign sovereign could not sue in the courts of the state on claims over one year old, such a declaration of state policy would clearly be an invalid encroachment upon the federal power to recognize such government on the basis of equality with other foreign powers. While the matter is less clear when the state legislation treats all suitors alike, nevertheless any limitation statute, if applied to foreign governments, will impose upon the sovereign vicarious responsibility for the neglect of his agent in the United States promptly to bring suit to enforce his sovereign's right of action. The principle that a sovereign ought not to suffer from the negligence of his officers and servants cannot, we believe, be abrogated by state legislation with respect to a foreign sovereign any more than it can with respect to the United States. See Gibson v. Chouteau, 13 Wall. 92, 99, 20 L.Ed. 534. To declare that the principle is applicable to the United States but not to a foreign sovereign is to accord to the latter less than full sovereign rights. Whether a foreign government shall be accorded less than full sovereign rights in the United States is a matter pertaining to international relations over which the national government has complete control. It is true that a sovereign who voluntarily comes into a local court must play the role of a litigant like any other suitor, and is subject to a properly assertable defense of set-off or counterclaim. United States v. National City Bank of New York, 83 F.(2d) 236, 238, 106 A.L.R. 1235 (C.C.A.2). That is a matter pertaining to procedure after the sovereign has sought the aid of the court. Here the effort is to charge the sovereign with responsibility for something which occurred before he sought the aid of the court; namely, his agent's failure to seek it more promptly. The rule as to set-off is not controlling as to the defense of limitation.

■ In our opinion the state statute is inapplicable to a foreign sovereign and the judgment appealed from must be reversed.

MANTON, Circuit Judge, concurs.

CHASE, Circuit Judge, dissents.

MANTON, Circuit Judge (concurring).

This is an appeal by the appellant from a judgment dismissing the complaint on the ground that the statute of limitations of the State of New York ran for more than six years prior to the instituting of the present action.

The action was started on September 22, 1934, by the United States, as assignee on November 16, 1933, of the Government of the Union of Soviet Socialist Republics against the Guaranty Trust Company of New York, for the recovery of $4,976,-722.78, with interest thereon from December 12, 1917, representing the balance of a deposit account of the former Imperial Russian Government opened on July 11, 1916, with the appellee.

Appellee claimed, in affidavits in support of its motion of dismissal, that during the years 1918 and 1919 it advised Bakhmetieff and Ughet, the ambassador and financial attaché, respectively, of the Provisional Government of Russia—the so-called Kerensky Government—that it would not pay the deposit account to the Russian embassy, and this refusal was construed by the appellee as an unequivocal refusal to pay, which, in its opinion, brought into operation the six-year period of limitations, thereby barring the present action.

The appellant replied that facts were lacking from which an unequivocal refusal to pay could be inferred, and that any communications addressed by the appellee to the representatives of the Provisional Government, subsequently to its overthrow in November, 1917, could not be binding upon the present Russian Government.

The court below held with the appellee, and ordered the suit dismissed. From such order this appeal is taken. The Civil Practice Act of New York provides (section 48):

"The following actions must be commenced within six years after the cause of action has accrued:

"1. An action upon a contract obligation or liability express or implied, except a judgment or sealed instrument."

The question for us to determine is whether the right of the Russian Government to the moneys here involved had been outlawed at the time that government executed its assignment of such moneys to the United States on November 16, 1933.

We are justified in regarding it as axiomatic in our law that a foreign sov-

ereign, without its consent, is not amenable to suit in our courts, and that its property is not subject to their process. This principle springs from considerations of public policy which it is in the interest of one sovereign to observe toward another sovereign who, in legal contemplation at least, is entitled to claim a position of equality. There can be no submission of one sovereign nation to the laws of another, except where such submission is voluntary. Judicial compulsion among sovereign states would be a legal monstrosity which would certainly destroy that perfect equality which is the basis of admission to membership in the international community. This sovereign immunity is so sweeping in character that it extends to all classes of actions, whether in rem or in personam. From this premise it follows that the laws of the local sovereign have no application to a foreign sovereign or his property, when such sovereign has taken no affirmative action to submit to the local jurisdiction. In other words, local laws are not made for the observance of, and the sanctions they carry cannot be construed to contemplate, foreign sovereigns. These general principles are today admitted quite generally. In the case of The Schooner Exchange v. M'Faddon, 7 Cranch, 116, 137, 3 L.Ed. 287, Chief Justice Marshall remarked:

"This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects. One sovereign being in no respect amenable to another; and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express license, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him."

In United States v. Diekelman, 92 U.S. 520, 524, 23 L.Ed. 742, the Supreme Court said: "His own dignity, as well as the dignity of the nation he represents, prevents his appearance to answer a suit against him in the courts of another sovereignty, except in performance of his obligations, by treaty or otherwise, voluntarily assumed.".

In England, the courts have taken the same position. In the leading case of The Parlement Belge, [1880] 5 Prob.Div. 197, 214, Brett, L.J., said: "The principle to be deduced from all these cases is that, as a consequence of the absolute independence of every sovereign authority, and of the international comity which induces every sovereign state to respect the independence and dignity of every other sovereign state, each and every one declines to exercise by means of its Courts any of its territorial jurisdiction over the person of any sovereign or ambassador of any other state, or over the public property of any state which is destined to public use, or over the property of any ambassador, though such sovereign, ambassador, or property be within its territory, and, therefore, but for the common agreement, subject to its jurisdiction."

From time to time English tribunals have had the occasion to adhere to these views. Duke of Brunswick v. King of Hanover, 6 Beav. 1, 49 Eng.Reprint, 724; Mighell v. Sultan of Johore, [1894] 1 Q.B. 149, 153; The Gagara, [1919] Prob.Div. 95 C.A.; The Porto Alexandre, [1920] Prob.Div. 30, C.A. The position of the courts in France (Spanish Government v. Cassaux, Dalloz, 1849: 1–5; Sirey, 1849: 1–81), Germany (French Shares Case, 1928, Annual Digest, 1927–1928, Case No. 103), the Netherlands (DeBooy v. German Reich, Annual Digest, 1919–1922, Case No. 84), and Japan (Matsuyama & Sons v. Republic of China, Annual Digest 1927–1928, Case No. 107), is the same.

More recently in United States v. Belmont, 57 S.Ct. 758, 759, 81 L.Ed. —, decided May 3, 1937, the Supreme Court, passing on the very assignment here in question, said: "and the case, therefore, presents a question of public concern, the determination of which well might involve the good faith of the United States in the eyes of a foreign government. * * * We are of opinion that no state policy can prevail against the international compact here involved."

And again: "Complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states. Compare U. S. v. Curtiss-Wright Export Corp., 299 U.S.

304, 316, 57 S.Ct. 216, 219, 81 L.Ed. 255. In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the state of New York does not exist. Within the field of its powers, whatever the United States rightfully undertakes, it necessarily has warrant to consummate. And when judicial authority is invoked in aid of such consummation, State Constitutions, state laws, and state policies are irrelevant to the inquiry and decision."

Is the principle of immunity the same when a local resident asserts an adverse claim, as in this case, against the property of a foreign sovereign which he holds in trust, but which such sovereign does not wish to litigate in the local tribunals? It seems to be reasonably clear that, if there is no legal obligation to submit to the local jurisdiction, then there is no correlative obligation to litigate such claim in the local courts, and that, as long as there is no voluntary submission, the provisions of the local law can have no application. No local statute can be invoked to compel a foreign state to submit to a local jurisdiction. That would be inconsistent with the principle of sovereign immunity. The only recourse available in such cases to the claimant is political and not judicial. U. S. v. Diekelman, supra. While there is no direct ruling upon the question, we find this definite statement in U. S. v. Nashville, Chattanooga & St. Louis Ry. Co., 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L. Ed. 81:

"It is settled beyond doubt or controversy, upon the foundation of the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided, that the United States, asserting rights vested in them as a sovereign government, are not bound by any statute of limitations unless congress has clearly manifested its intention that they should be so bound." See Chesapeake & D. Canal Co. v. U. S., 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889.

This statement points to the conclusions that the principle of public policy enunciated in it exempts all governments alike —including foreign governments, undoubtedly—from the application of local statutes of limitations. If it is said that this principle amounts to granting to a foreign sovereign a position of privilege toward residents of the local sovereign, the answer is that such result is inevitable. The political character and extraterritorial privileges admitted in all sovereigns, including our own, necessarily place the sovereign in an exceptional position toward the individual. Local laws, we said, cannot be presumed to contemplate the regulation of the person, acts, or property of a foreign sovereign; so that, without an express engagement by such government to that end, there can be no presumption that he has agreed to submit to the local jurisdiction. Any one, in fact, who deals with a foreign sovereign must be presumed to do so with the implied understanding that the transaction is to be governed by the law of such sovereign and not by a law alien to him and to which he is under no obligation to submit. When we consider the question in the light of international comity, which is a matter between sovereign governments, we may observe that, if the national government permits a foreign sovereign to come or bring his property within our jurisdiction without any other conditions or restrictions than those of a political nature which one sovereign owes to another sovereign, then neither he nor his property lose their extraterritorial privileges and the courts are debarred from enforcing the provisions of the local law as to him or his property. To permit any action against either would be contrary to the principles of international comity. The Gagara, [1919] Prob.Div. 95 C.A. In the case of The Schooner Exchange v. M'Faddon, supra, the Supreme Court said: "A nation would justly be considered as violating its faith, although that faith might not be expressly plighted, which should suddenly and without previous notice, exercise its territorial powers in a manner not consonant to the usages and received obligations of a civilized world."

In the case at bar, it does not appear that the privileges of international comity were denied by our government to the government of Russia at any time. Moreover, in international law the states of the Union pass unnoticed. They do not possess international personality. Our dealings as a nation with other nations must be conducted only through the government of the Union. It is that government which alone possesses the right and power to enter into negotiations with foreign sovereigns

and to extend to them the benefits and courtesies customary under the comity practiced between nations. No local political subdivision such as a state of the Union has the right to impair the international comity which it is within the power of the national government alone to grant to other governments. To permit a state to do so would be to give such state a license to interfere with the general government's conduct of its foreign relations, all of which would be constitutionally unsound and internationally dangerous. If, therefore, both the Soviet Government and its property enjoyed immunity from our laws according to our understanding of the principles and practice of international law and comity, the Soviet Government was not bound by a local statute of limitations and the United States as its assignee took the moneys transferred by such assignment free from the disabilities of the statute.

It has been decided on good authority that, since the diplomatic representative of a foreign sovereign is immune from suit in the courts of the nation to which he is accredited, the running of the statute of limitations in his favor is suspended while he retains his diplomatic status and cannot be brought into court. Masurus Bey v. Gadban et al., [1894] 2 Q.B. 352, C. A. That is to say, his political character has the effect of suspending as to him the application of all local statutes. There is nothing in the law of nations which compels him either to sue or to submit to suit. If he does not submit voluntarily, he cannot claim the benefit of a statute of limitations because he is free from the jurisdictional control of the local sovereign; and the statute cannot be invoked against him because there is no law which requires him to sue. If there is no principle of law requiring him to sue or to submit to suit as the case may be, it is plain that no local statute can be evoked against or by him. If this is true as to the political representative, it is truer still as to his sovereign.

The principle of inapplicability of the statute of limitations has been invoked in arbitration claims.[1]

For these reasons I am of the opinion that the judgment should be reversed.

---

[1] Collac v. Yugoslav State, May 15, 1929, Annual Digest 1929–1930, Case No. 121. Applicant, a Hungarian national, claimed restitution of certain machinery which was seized in August, 1920, by Yugoslav authorities and sold as war booty, or, alternatively, the payment of an indemnity. Claimant contended that Yugoslav authorities acted contrary to article 250 of the Treaty of Trianon which provided that "the property, rights and interests of Hungarian nationals * * * situated in the territories which formed part of the former Austro-Hungarian Monarchy shall not be subject to retention or liquidation" in accordance with the provisions of article 232 and the annex to section IV. The respondent State invoked, inter alia, the rule of its municipal law which barred actions brought after the lapse of four years from the taking of property. The tribunal held for the claimant, saying: "Provisions of national laws relating to limitation of actions were capable of application before international tribunals only in so far as they conformed to the provisions of international law or supplemented them. Article 250 of the Treaty of Trianon invoked by the applicant fixed no period limiting the time within which the claims could be brought by virtue of its provisions."

George W. Cook Case, U. S.-Mexico Gen. Claims Com. 1927, Annual Digest 1927–1928, Case No. 174: "There is, of course, no rule of international law putting a limitation of time on diplomatic action or upon the presentation of an international claim to an international tribunal."