# Removal of Japanese Aliens and Citizens
# From Hawaii to the United States

Japanese who are aliens can be brought to the continental United States from Hawaii and interned under the provisions of 50 U.S.C. § 21. This statute, however, is probably not applicable to the Japanese who are American citizens.

Although not free from doubt, an argument can be made for removing Japanese who are American citizens from Hawaii to a restricted zone in the United States on grounds of military necessity.

In view of the changed conditions of modern warfare, the Supreme Court would likely follow the views of the dissenting justices in *Ex parte Milligan*, sustaining a declaration of martial law in places outside the zone of active military operations upon a showing of military necessity for such action. From the nature and purpose of martial law, it would seem to be properly applicable to particular areas rather than to particular persons.

May 16, 1942

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

1. Attached is a legal memorandum* on the subject.

2. As a practical matter, I understand that the Army feels the problem can be satisfactorily handled by removing the Japanese citizens from Hawaii and treating them the same way as those evacuated from the West Coast.

3. If this is so, it is not necessary to pass on the legal questions which you put. I should think therefore, that the War Department ought not now to be told the

---

* Editor's Note: The referenced memorandum begins after the line of asterisks on the next page. It was issued three months after Executive Order 9066, 7 Fed. Reg. 1407 (Feb. 19, 1942), which authorized the Secretary of War "to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, from which any or all persons may be excluded, and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion." It is not clear from our files what precipitated this opinion request from the Attorney General, or to whom the opinion may have been forwarded. The opinion does not appear to have been directed to a particular executive or military order, although it preceded by days a string of Civilian Restrictive Orders (8 Fed. Reg. 982–88), requiring the removal of "persons of Japanese ancestry" to various internment camps in the western United States. Another relocation/internment order—Civilian Exclusion Order No. 34, 7 Fed. Reg. 3967 (May 3, 1942), requiring the removal of persons of Japanese ancestry from Alameda County, California, and issued just two weeks prior—was upheld against constitutional challenge by the Supreme Court in *Korematsu v. United States*, 323 U.S. 214 (1944).

At the time of this opinion, military authorities had already set up internment camps on the Hawaiian Islands, including in particular Sand Island, through which internees were then transferred to internment camps on the continent. *See* Brian Niiya, *History of the Internment in Hawaiʻi* (June 4, 2010), http://www.hawaiiinternment.org/history-of-internment. In 1988, Congress formally recognized that "a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World War II," Pub. L. No. 100-383, § 2(a), 102 Stat. 903, 903 (codified at 50 U.S.C. App. § 1989a(a)), and ordered restitution for Japanese-American citizens and resident aliens who had been confined under one of the relocation/internment orders, *id.* § 105, 102 Stat. at 905-08 (codified at 50 U.S.C. App. § 1989b-4).

theory of removing and interning the Japanese. It is a conclusion not without doubt and it might be extended or abused. Like unto the Supreme Court, I think the decision ought to be saved for the specific case in which it is necessary.

* * * * *

You have asked me to consider whether (1) Japanese moved from Hawaii to the United States could be placed in a delimited zone in which martial law could be declared; (2) martial law could be declared with respect to a group of Japanese.

## I.

Those Japanese who are aliens can be brought to the continental United States and interned under the provisions of 50 U.S.C. § 21 (1940). This statute, however, is probably not applicable to the Japanese who are citizens.

## II.

Although not free from doubt, an argument can be made for removing Japanese who are American citizens from Hawaii to a restricted zone in the United States.

This is total war. It is quite unlike any prior war. Fifth column activities, espionage, and sabotage have been and are being employed on an unprecedented scale. What the Nazis did in Norway, Holland, Belgium, and France—to mention but a few places—through citizens of those places as well as through German nationals is now well known. The Japanese have used similar techniques. Axis agents— American citizens as well as non-citizens—participated in making the Japanese attack on Pearl Harbor so successful to the Japanese.

As a result of the Japanese attack, Hawaii has been put under martial law. Military necessity dictated that move—a move well justified under the legal authorities. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866); *United States v. Diekelman*, 92 U.S. 520, 526 (1875). Hawaii is still within the Pacific theatre of war and subject to attack again. Continuance of martial law in Hawaii is doubtless justified.

If military necessity dictates it—as it well may—those Japanese who were interned in Hawaii or those whose presence is dangerous can be removed. To hold otherwise would be deciding upon the impractical. Hawaii is virtually an armed fortress. All of the energies of the armed forces there should doubtless be concentrated on resisting or striking the enemy. If, because of the military needs, the forces cannot be spared to guard or watch the Japanese in Hawaii, they can be removed.

The strongest legal ground upon which to make the removal would be under an order of the military commander in Hawaii to a restricted area—a military area or military zone—designated by the Secretary of War under Public Law 77-503, 56 Stat. 173 (1942), *codified at* 18 U.S.C. § 97a (Supp. II 1942).

If this is done, it would not be necessary to declare martial law with respect to these Japanese as a group. A declaration of martial law as to a group is of doubtful legal validity except possibly under unusual circumstances. The circumstances here involved might be such. But I would be inclined not to rely on this method of handling the problem.

## III.

The existing case law indicates some doubt on the power to remove and intern the Japanese citizens in the United States. But the conditions of modern warfare are different from those of prior wars. Because of this the courts might well follow a different course than that indicated by the earlier decisions. *Ex parte Ventura*, 44 F. Supp. 520 (W.D. Wash. 1942).

If the majority opinion in *Ex parte Milligan* should be followed today, a declaration of martial law outside the zone of active military operations at a place where the courts are functioning would probably not be approved by the Supreme Court. It is believed, however, that, in view of the changed conditions of warfare, the Supreme Court, in a proper case, would follow the views of the dissenting justices in the *Milligan* case sustaining a declaration of martial law in places outside the zone of active military operations upon a showing of military necessity for such action. Martial law, however, is ordinarily made applicable to districts or areas and when established applies to all persons within the district or area so long as they remain therein. There appear to be no precedents sustaining a declaration of martial law with respect only to a particular group of persons as suggested in your question numbered 2. From the nature and purpose of martial law, it would seem to be properly applicable to particular areas rather than to particular persons.

The establishment of martial law in a delimited zone for the sole purpose of confining therein a particular citizen or group of citizens would also raise questions of policy and public morals. If this can be done with respect to the Japanese here involved, it might be done at any time with respect to any citizen. Thus, it would approach the practices of the German and Italian governments, so bitterly denounced in this country, of establishing citizen concentration camps in which citizens may be confined without due process of law.

There is considerable authority for the position that military necessity for the establishment of martial law is a political question into which the courts will not inquire. There is, however, authority on the other side of this question, and in the comparatively recent case of *Sterling v. Constantin*, 287 U.S. 378 (1932), the Court inquired into this question and determined that military necessity did not exist. That case may be distinguishable since it involved a question of conflict between state and federal jurisdiction. There is sufficient language to indicate, however, that the Court would have the right to and would inquire into the necessity for declaring martial law if the occasion arose. A declaration of martial law in a delimited zone for the sole purpose of confining therein objectionable

citizens might not be a good case in which to have this question directly passed upon by the Court.

The desired result might be obtained by a suspension of the privilege of the writ of habeas corpus as to the Japanese citizens involved. There is precedent for the suspension of the privilege of the writ as to particular persons. *See* 6 *A Compilation of the Messages and Papers of the Presidents (1789–1908)* 19 (James D. Richardson ed., 1909). This, however, raises the same question of policy and public morals above discussed. If the privilege of the writ can be suspended as to Japanese citizens, it can likewise be suspended as to other citizens at any time. Also, if the suspension should be made by the President, it would reopen the age-old question of whether the President has the authority to suspend or whether that right lies in the Congress alone. I think the President has the power, but whether the controversy over this subject should be again precipitated at this time is a question which should be carefully considered.

## IV.

1. If it is at all practical to do so, the safest legal procedure would be to hold the Japanese who are American citizens in Hawaii.

2. The next best legal procedure would be, under the martial law prevailing in Hawaii or under an order pursuant to Public Law 77-503, to intern them in Hawaii and then give them the option to come to the United States if they sign up as members of the work corps of the War Relocation Authority under an agreement to serve for the duration of the war.

3. It would also be proper to evacuate the Japanese citizens from Hawaii under Executive Order 9066 and Public Law 77-503 and then treat them the same as the Japanese evacuated from the West Coast.

4. If it is not necessary for these Japanese to be kept in strict confinement it may be that, in view of the large industrial plants along the East Coast and in many cities extending westward to the Mississippi, military areas might be declared along the entire East Coast and extending inward some distance, thus requiring the Japanese, under Public Law 77-503, to reside in the Middlewest, where they would probably have less opportunity to engage in activities dangerous to the national safety.

5. It is possible that the Japanese citizens legally could be removed from Hawaii and interned in the United States.

OSCAR C. COX
*Assistant Solicitor General*
