BYBEE, Circuit Judge,
dissenting:
In Sosa v. Alvarez-Machain, the Supreme Court addressed arguments that “international law requires that before asserting a claim in a foreign forum, the claimant must have exhausted any remedies available in the domestic legal system.” 542 U.S. 692, 733 n. 21, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). Although declining to do so in Sosa, the Court declared that it “would certainly consider this requirement in an appropriate case.” Id. This is such a case.[1]
Plaintiffs-Bougainvilleans alleged that Rio Tinto, a multinational British corporation, violated various jus cogens, including war crimes, crimes against humanity, racial discrimination, and environmental despoliation. They also allege that Rio Tinto directed these actions through the government of Papua New Guinea (“PNG”). These actions took place beginning in the early 1960s, culminating in a 10-year civil war from 1990 to 2000. See Sarei v. Rio Tinto PLC, 221 F.Supp.2d 1116, 1121-27 (C.D.Cal.2002). In 2001, the U.S. Department of State warned that adjudication of the Bougainville claims in U.S. courts posed a “very grave” threat to the “conduct of our foreign relations.” The State Department’s Statement of Interest was backed by assurances from the then-PNG government that litigation in U.S. courts had “potentially very serious ... implications” for PNG and “especially its relations with the United States.” On reargument following Sosa, we now have evidence before us, although it is unauthenticated, that the new PNG government regards this suit as “helping to] facilitate the process ... of rectifying ... historic injustices” and that U.S.-PNG relations will actually be adversely affected “if the litigation is discontinued.”
This case cries for exhaustion of local remedies before we assume jurisdiction. The majority holds that it “cannot conclude that legislative intent supports [finding] an exhaustion requirement” in the Alien Tort Claims Act (“ATCA”), 28 U.S.C. § 1350, and, as a matter of discretion, the majority declines to create one. Maj. op. at 1218-19. The majority then reverses the district court, finding that the case is justiciable without infringing U.S. or PNG prerogatives under the political question, act of state, and comity doctrines. I would draw different inferences from the Act and its complicated history.
ATCA provides jurisdiction in federal courts for causes of action created by substantive international law. In my view, international law requires exhaustion of *1225 local remedies as a condition to bringing an international cause of action in a foreign tribunal. Even if international law did not so require exhaustion, I would, as an exercise in discretion, require it as a matter of our domestic law. Exhaustion promotes comity between Article III courts and any processes available for resolving disputes within PNG, and it preserves our own role within the separation of powers. I respectfully dissent.
I
The Supreme Court has “acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts.” McCarthy v. Madigan, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992), swperceded by statute as stated in Booth v. Churner, 532 U.S. 731, 732, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). “[EJxhaustion was originally a judge-made rule designed not as a technical doctrine but rather to prevent premature and unjustified interference in state proceedings.” Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 333 n. 3, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (Stevens, J., concurring in part and concurring in the judgment); see also Carr v. Pac. Mar. Ass’n, 904 F.2d 1313, 1321 (9th Cir.1990) (applying an exhaustion requirement that “is a judge-made requirement, not one mandated by [the applicable statute] or collective bargaining agreement”). It is thus “grounded in principles of comity.” Castille v. Peoples, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). Judge-made or prudential exhaustion is not a prerequisite to the exercise of jurisdiction, but rather “one among related doctrines — including abstention, finality, and ripeness — that govern the timing of federal-court decisionmaking.” McCarthy, 503 U.S. at 144, 112 S.Ct. 1081. Prudential exhaustion does not go to the power of the court — it does not deprive the court of jurisdiction — but holds that “that power will not ordinarily be exercised until after an appeal made to the State courts has been denied.” Davis v. Burke, 179 U.S. 399, 401-02, 21 S.Ct. 210, 45 L.Ed. 249 (1900).[2] In effect, the exhaustion requirement holds that even if the dispute is ripe, it may not be ripe for decision in this forum.
Although federal courts created the exhaustion doctrine in the habeas context to prevent “unnecessary conflict between [federal and state] courts equally bound to guard and protect rights secured by the constitution,” Ex parte Royall, 117 U.S. 241, 251, 6 S.Ct. 734, 29 L.Ed. 868 (1886), we have required exhaustion in other contexts where it will respect the processes afforded by a separate sovereign. For example, the Supreme Court has required exhaustion of tribal remedies so as not to “impair the authority of tribal courts,” and to “reflectn the fact that Indian tribes retain ‘attributes of sovereignty over both their members and their territory.’ ” Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 14-15, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (quoting United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975)). In National Farmers Union Insurance Cos. v. Crow Tribe, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), the Court reversed the judgment and remanded the case because “[u]ntil petitioners have exhausted the remedies available to them in the Tribal Court system, it would be premature for a federal court to consider any relief.” Id. at 857, 105 S.Ct. 2447 (citation omitted). Referring to National Farmers, the Court later com *1226 mented that “considerations of comity directed] that tribal remedies be exhausted” even though “the existence of tribal court jurisdiction presented a federal question within the scope of 28 U.S.C. § 1331.” Iowa Mut., 480 U.S. at 15, 107 S.Ct. 971.
The Court has also required exhaustion of federal administrative remedies as “ ‘an expression of executive and administrative autonomy.’ ” McKart v. United States, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) (quoting Louis L. Jaffe, Judicial CONTROL of Administrative Action 425 (1965)); see also Pavano v. Shalala, 95 F.3d 147, 150 (2d Cir.1996) (“Parties are generally required to exhaust their administrative remedies, in part because of concerns for separation of powers.”); Muhammad v. Carlson, 739 F.2d 122, 124 (3d Cir.1984) (“The principles of exhaustion have a constitutional dimension. For courts to act prematurely, prior to the final decision of the appropriate administrative agency, would raise a serious question implicating the doctrine of separation of powers.”), superceded by statute as recognized in Nyhuis v. Reno, 204 F.3d 65, 71 n. 7 (3d Cir.2000). The Court has explained its concerns:
Certain failures to exhaust may deny the administrative system important opportunities “to make a factual record” ... or “to exercise its discretion or apply its expertise” in the course of deci-sionmaking. There may be a danger that relaxation of exhaustion requirements, in certain circumstances, would induce “frequent and deliberate flouting of administrative processes,” thereby undermining the scheme of decisionmak-ing that Congress has created. And of course, a strict exhaustion requirement tends to ensure that the agency have additional opportunities “to discover and correct its own error,” and thus may help to obviate all occasion for judicial review.
McGee v. United States, 402 U.S. 479, 484, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (citations omitted) (quoting McKart, 395 U.S. at 194-95, 89 S.Ct. 1657); see also Zara v. Ashcroft, 383 F.3d 927, 931 (9th Cir.2004); Ruviwat v. Smith, 701 F.2d 844, 845 (9th Cir.1983) (per curiam).
As I discuss in Part IV. A, I believe that the same considerations of respect for state and tribal judicial processes dictate that we stay our hand out of deference to foreign processes that may resolve disputes that could otherwise be brought before us under ATCA. Furthermore, as I discuss in Part IV. B, separation of powers concerns over the judiciary’s role in mediating disputes that may implicate the foreign affairs powers of the United States further recommend that parties exhaust their local remedies before coming to the courts of the United States. Before addressing these two points, however, I address in Part II the question of whether Congress has statutorily precluded exhaustion in this case, and in Part III whether, as a matter of international norms, exhaustion of local remedies is required before claims may be brought in a foreign or supranational forum.
II
A
“Notwithstanding the[ ] substantial institutional interests [promoted by exhaustion of remedies], federal courts are vested with a ‘virtually unflagging obligation’ to exercise the jurisdiction given them.” McCarthy, 503 U.S. at 146, 112 S.Ct. 1081 (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817-18, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). On the other hand, “[t]he injunction to hear the case summarily, and thereupon to dispose of the party as law and justice require, does not deprive the court of discretion as to the time and mode in *1227 which it will exert the powers conferred upon it.” Ex parte Royall, 117 U.S. at 251, 6 S.Ct. 734 (internal quotation marks omitted). What is critical for us is whether in ATCA Congress has spoken clearly to the question of exhaustion of remedies — either to compel or forbid exhaustion — because otherwise we may consider the wisdom of the rule for ourselves. “Unlike other statutory questions, exhaustion is ‘a rule of judicial administration,’ and unless Congress directs otherwise, rightfully subject to crafting by judges.” Patsy v. Bd. of Regents, 457 U.S. 496, 518, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (White, J., concurring in part) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50, 58 S.Ct. 459, 82 L.Ed. 638 (1938)).
B
Without repeating all that the majority has covered, I begin with the obvious: ATCA does not expressly require exhaustion of remedies before an alien may invoke the jurisdiction of U.S. courts and seek a remedy in “tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.[3] As the majority points out, in what little legislative history we have on ATCA — and the record is scant — there is no mention of exhaustion of local remedies. Moreover, as the Torture Victim Protection Act (“TVPA”) evidences, Congress knows how to require exhaustion of remedies for torts “committed in violation of the law of nations or a treaty of the U.S.” when it wishes to do so. See Pub.L. No. 102-256, § 2(b), 106 Stat. 73, codified at 28 U.S.C. § 1350 note, § 2(b) (“A court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.”).
When two statutes address similar matters and one of them expressly requires an act while the other is silent, it is perfectly reasonable to infer that Congress intended that the act be performed in the one case, but not in the other. Bates v. United States, 522 U.S. 23, 30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997); Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); Sarei, 221 F.Supp.2d at 1132-39; see also Maj. op. at 1217. This inference does not hold, however, with respect to exhaustion. Ordinarily, for domestic matters, “[o]f ‘paramount importance’ to any exhaustion inquiry is congressional intent,” so that “[wjhere Congress specifically mandates, exhaustion is required. But when Congress has not clearly required exhaustion, sound judicial discretion governs.” McCarthy, 503 U.S. at 144, 112 S.Ct. 1081 (emphasis added) (quoting Patsy, 457 U.S. at 501, 102 S.Ct. 2557). If we may require exhaustion in the absence of a congressional mandate in domestic law, surely we may do so for causes of action that are not created under domestic law, particularly where, as I discuss in Part III, exhaustion is a well-recognized requirement of the “law of nations.”
If ATCA and TVPA were purely domestic statutes I might find the inference drawn from the differences between the two statutes persuasive. Although it is true, as the district court noted, that ATCA is “a creature of domestic law,” 221 F.Supp.2d at 1139, ATCA does not deal exclusively with domestic matters. ATCA both creates jurisdiction in Article III courts — a matter within Congress’s domestic powers, see U.S. Const, art. Ill, § 1— *1228 and implicitly recognizes that there are causes of action in tort created by the law of nations or by treaties of the United States. See Sosa, 542 U.S. at 731 n. 19, 124 S.Ct. 2739. ATCA, however, does not create such causes of action; instead, it looks to non-domestic sources of law to create such causes of action. Id. at 724, 124 S.Ct. 2739. By contrast, TVPA is not a jurisdiction-creating statute; rather, it creates a domestic cause of action against any “individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture.” Pub.L. No. 102-256, § 2(a)(1), 106 Stat. 73, codified at 28 U.S.C. § 1350 note, § 2(a)(1); see also Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 104-05 (2d Cir.2000). Prior to TVPA’s enactment in 1992, such an action, being a violation of jus cogens, see Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714-15 (9th Cir.1992), could have been brought in federal court under the jurisdiction of ATCA. TVPA establishes torture as “an unambiguous and modern basis for a cause of action,” thus eliminating any question of an available remedy in U.S. courts. H.R. Rep. No. 102-367, pt. 2, at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86. If the majority is correct, however, then TVPA has actually narrowed the U.S. remedy for torture by requiring exhaustion in TVPA where it was not previously required for causes of action brought under ATCA. It is thus more difficult to bring a torture claim in federal courts— because of the exhaustion requirement— than it is other international causes of action.[4] See Maj. op. at 1216 n. 26; see also Enahoro v. Abubakar, 408 F.3d 877, 884-86 (7th Cir.2005); id. at 889-90 (Cu-dahy, J., dissenting).
It makes little sense to think that Congress, having codified a cause of action for torture would, at the same time, restrict its availability. If Congress intended to subject a cause of action for torture to procedural demands not required for violation of other jus cogens, we might have expected Congress to comment on the new requirement. Instead, Congress simply commented on the utility of the exhaustion requirement to “ensure[] that other U.S. courts will not intrude into cases more appropriately handled by courts where the alleged torture or killing occurred. It will also avoid exposing U.S. courts to unnecessary burdens, and can be expected to encourage the development of meaningful remedies in other countries.” H.R. Rep. No. 102-367, pt. 1, at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 87-88.
Furthermore, the majority’s comparison of ATCA and TVPA ignores their unique history. Congress enacted TVPA in response to uncertainty over ATCA following Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), and the Edwards-Bork debate in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C.Cir.1984). TVPA clarifies ATCA, providing an “unambiguous” cause of action for torture and extrajudicial killing. Because Congress left ATCA “intact,” presumably it continues to mean *1229 what it meant prior to 1992. Where the majority and I part is over how to read ATCA in light of the subsequent enactment of TVPA: I would read little into ATCA from the enactment of TVPA more than 200 years later; the majority infers that exhaustion, which was expressly included in TVPA, must necessarily have been left out of ATCA, which has no exhaustion requirement. As I previously suggested, the inference the majority draws from this comparison might be reasonable in some contexts; I do not believe it is useful here. Indeed, applying the majority’s principle might lead us to conclude that ATCA has no statute of limitations — since the ATCA is silent, but TVPA contains an express limitation. Compare 28 U.S.C. § 1350 (containing no express statute of limitations) with 28 U.S.C. § 1350 note, § 2(c) (providing for a ten-year statute of limitations). We have already rejected this conclusion. In fact, we employed the opposite inference, reading TVPA’s express statute of limitations back into ATCA. See Deutsch v. Turner Corp., 324 F.3d 692, 717 n. 18 (9th Cir.2003); Papa v. United States, 281 F.3d 1004, 1011-12 (9th Cir.2002) (“We are squarely faced with the issue here, and we decide that the statute of limitations applicable to the ATCA is that provided by the TVPA.”). Furthermore, the majority’s reasoning suggests that torture and extrajudicial killing, having been expressly included in TVPA, must be read out of ATCA, meaning that causes of action for these offences are no longer part of the law of nations. See Enahoro, 408 F.3d at 884-85, 886 (holding that torture claims are no longer available under ATCA — not because torture is excluded from the law of nations — but because TVPA now “occupies] the field”).[5]
It makes more sense to think that Congress codified the exhaustion requirement because it believed it was consistent with international law and, thus, consistent with other causes of action that would come within ATCA’s jurisdiction. The Senate Judiciary Committee cited international practice as proof that TVPA’s exhaustion requirement was appropriate. “[T]he procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use.” S. Rep. No. 102-249, pt. 4, at 10 (1991). The committee explained that “as this legislation involves international matters and judgments regarding the adequacy of procedures in foreign courts, the interpretation of [the exhaustion provision], like the other provisions of this act, should be informed by general principles of international law.” Id.
While TVPA evidences Congress’s recognition of exhaustion in international law, we should not draw a contrary inference from the absence of an express exhaustion requirement in ATCA. As I have mentioned, TVPA is not a jurisdiction-creating statute. Rather, it creates a cause of action for which there is jurisdiction in the U.S. courts under ATCA. See Hilao v. Estate of Marcos, 103 F.3d 767, 778 (9th Cir.1996). ATCA, by contrast, is a jurisdiction-creating statute. See Sosa, 542 U.S. at 729, 124 S.Ct. 2739. In and of itself, ATCA does not require exhaustion as a condition precedent to the exercise of jurisdiction by Article III courts. At the same time, ATCA acknowledges the existence of causes of action recognized by *1230 international law or created by U.S. treaties. As the Court explained in Sosa, “the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations” and such “norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.” Id. at 724-25,124 S.Ct. 2739; see also id. at 730-31, 124 S.Ct. 2739. The elements of those substantive causes of action are defined by international law, not by our domestic law, and may be subject to an exhaustion requirement if international law would recognize exhaustion of remedies as an international law norm. To the extent we think there is ambiguity between the explicit requirement of TVPA and the implicit mandate of ATCA, we should resolve the ambiguity in favor of a reading that accords with international law. See Murray v. Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) (“[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains.”).
This approach comports with our previous efforts to harmonize ATCA with the more explicit requirements of TVPA. As Judge Cudahy has explained, “an implicit exhaustion requirement in the ATCA would have something to recommend it. Doing so would, among other things, bring the Act into harmony with both the provisions of the TVPA (with which it is at least partially coextensive) and with the acknowledged tenets of international law.” Enahoro, 408 F.3d at 889-90 (Cudahy, J., dissenting).[6] It would also comport with Sosa’s mandate that we exercise “great caution” in expanding the range of claims that can be heard under ATCA.[7] 542 U.S. at 728, 124 S.Ct. 2739. It is to the question whether international law requires exhaustion of local remedies that I now turn.
Ill
At the time of its enactment, ATCA granted federal courts jurisdiction “to hear claims in a very limited category defined by the law of nations and recognized at common law.” Sosa, 542 U.S. at 712, 124 S.Ct. 2739. Although “a consensus understanding of what Congress intended has proven elusive,” the Sosa Court determined that “no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases ... has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law.” Id. at 719, 724-25, 124 S.Ct. 2739. Claims that may be brought within ATCA are not limited to those permitted under the law of nations as it existed at the time of the statute’s enactment in 1789; but include those “based on the present-day law of *1231 nations” as long as they “rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.” Id. at 725, 124 S.Ct. 2739. There is strong evidence that international law — as evidenced in a variety of sources — recognizes exhaustion of remedies as a condition precedent to seeking relief before foreign and international tribunals.
Exhaustion is a well-established principle of international law, recognized by courts and scholars both here and abroad. It is so well entrenched that one scholar has written that “the celebrated ‘rule of local remedies’ is accepted as a customary rule of international law [and] needs no proof today, as its basic existence and validity has not been questioned,” and that the rule’s “wide and unchallenged acceptance is evidence of its utility and of the soundness of its policy foundation.” Chit-THARANJAN FELIX AMERASINGHE, LOCAL REMEDIES in International Law 3 (2d ed.2003); David R. Mummery, The Content of the Duty to Exhaust Local Judicial Remedies 58 Am. J. Int’l L. 389, 390 (1964); see also Ian BROwnlie, Principles of Public International Law 472-73 (6th ed. 2003) (“A claim will not be admissible on the international plane unless the individual alien or corporation concerned has exhausted the legal remedies available to him in the state which is alleged to be the author of the injury. This is a rule which is justified by practical and political considerations.... ”).
A
The United States has long recognized exhaustion of local remedies as a principle of international law. The Jay Treaty, drafted just five years after ATCA, included an exhaustion provision. Creditors could only turn to the arbitration tribunal established by the treaty if they could not obtain recourse through “the ordinary course of judicial proceedings.” See Treaty of Amity, Commerce, and Navigation (Jay Treaty), U.S.-U.K., art. VI, Nov. 19, 1794, 8 Stat. 116.[8] According to the Restatement (Third) of the Foreign Relations Law of the United States, remedies for human rights violations may be pursued “only after the individual claiming to be a victim of a human rights violation has exhausted available remedies under the domestic law of the accused state,” or has shown that such efforts would be futile. § 703 comment d (1987). The executive branch recognized the power of the principle when it required U.S. nationals to exhaust their available remedies in Castro’s Cuba, explaining that “[t]he requirement for exhaustion of legal remedies is based upon the generally accepted rule of international law that international responsibility may not be invoked ... until after exhaustion of the remedies available under *1232 local law.” United States State Department Memoranda of March 1,1961, quoted in Ernest L. Kerley, Contemporary Practice of the United States Relating to International Law, 56 Am. J. Int’l L. 165, 167 (1962); see also Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 422-23, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (“Because of [international law’s] peculiar nation-to-nation character the usual method for an individual to seek relief is to exhaust local remedies and then repair to the executive authorities of his own state to persuade them to champion his claim in diplomacy or before an international tribunal.”).
B
International tribunals have also recognized and applied exhaustion, regardless of whether the principle has been called for in a formal agreement.[9] The International Court of Justice has repeatedly declined to hear cases on this ground, explaining that “the rule that local remedies must be exhausted before international proceedings may be instituted is a well-established rule of customary international law.” Inter-handel (Switzerland v. United States of America), 1959 I.C.J. 6, 27 (March 21), see also Case Concerning Avena and Other Mexican Nationals (Mexico v. United States), 2004 I.C.J. 12, 128 (March 31) (allowing Mexico’s claims to proceed, but barring individual claims because “[t]he individual rights of Mexican nationals ... are rights which are to be asserted, at any rate in the first place, within the domestic legal system of the United States.”) (quotations omitted); Case of Certain Norwegian Loans (France v. Norway), 1957 I.C.J. at 39 (Lauterpacht, J., concurring and dissenting) (explaining that “however contingent and theoretical these remedies may be, an attempt ought to have been made to exhaust them”). The ICJ has recognized that the exhaustion requirement is so fundamental that, even where an international agreement fails to include the provision, it exists by default unless the agreement expressly states that exhaustion is not required. International jurisprudence is “unable to accept that an important principle of customary international law should be held to have been tacitly dispensed with, in the absence of any words making clear an intention to do so.” Case Concerning Elettronica Sicula S.p.A. (United States v. Italy), 1989 I.C.J. 15, 42, 76 (July 20); see also Case Concerning Avena, 2004 I.C.J. at 48 n. 97 (Counter-Memorial of the United States of America) (“The Court has found the exhaustion requirement so important a principle of customary international law that it held that the requirement of exhaustion may not be assumed to have been dispensed with under a treaty unless that treaty expressly so provides.”); A.O. Adede, A Survey of Treaty Provisions on the Rule of Exhaustion of Local Remedies, 18 Hakv. Int’l L.J. 1, 8 n. 19 (1977) (noting that where exhaustion is not explicitly provided, it may not be treated as excluded, as “no such implication from the mere fact of silence is proper”).
The American Convention on Human Rights, European Convention for the Protection of Human Rights and Fundamental Freedoms, International Convention on the Elimination of All Forms of Racial Discrimination, and the African Commission on Human and Peoples’ Rights all require exhaustion. See Organization of American States, American Convention on Human Rights art. 46(l)(a), Nov. 22, 1969, *1233 O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, 155, 9 I.L.M. 673, 687 (A requirement of admission of a petition or communication is “that the remedies under domestic law have been pursued and exhausted in accordance with generally recognized principles of international law”); Council of Europe, European Convention for the Protection of Human Rights and Fundamental Freedoms art. 35(1), Nov. 4, 1950, 321 U.N.T.S. 221, E.T.S. 5, as amended by Protocol No. 3, E.T.S. 45, Protocol No. 5, E.T.S. 55 and Protocol No. 8, E.T.S. 118 (“The Court may only deal with the matter after all domestic remedies have been exhausted, according to the generally recognised rules of international law....”); International Convention on the Elimination of All Forms of Racial Discrimination, art. 11, para. 3, March 7, 1960, 660 U.N.T.S. 211, 226 (“The Committee shall deal with a matter referred to it in accordance with paragraph 2 of this article after it has ascertained that all available domestic remedies have been invoked and exhausted in the case, in conformity with the generally recognized principles of international law. This shall not be the rule where the application of the remedies is unreasonably prolonged.”); African Charter on Human and Peoples’ Rights, art. 50, June 27, 1981, 1520 U.N.T.S. 217, 255, 21 I.L.M. 58 (“The Commission can only deal with a matter submitted to it after making sure that all local remedies, if they exist, have been exhausted, unless it is obvious to the Commission that the procedure of achieving these remedies would be unduly prolonged.”). Exhaustion is so well established that the failure to include an exhaustion requirement may call the viability of the agreement into question.
The local remedies rule [adopted in the UN Covenant of Civil and Political Rights] assumed a central role in the debates on the right of individual petition. In fact, one may legitimately wonder whether that right would have been granted at all (even in an optional protocol) had the rule not been provided for.
A.A. Cangado Trindade, Exhaustion of Local Remedies Under the UN Covenant on Civil and Political Rights and its Optional Protocol, 28 Int’l & Comp. L.Q. 734, 755 (1979).
It is far from clear that, as the majority claims, “exhaustion is procedural rather than substantive.” Maj. op. at 1221. In a recent meeting of the UN-sponsored International Law Commission, delegates were still engaged in “the long-standing game of debating whether the rule of exhaustion of local remedies is substantive or procedural,” “an issue on which much intellectual energy has been wasted.” Robert Rosenstock & Margo Kaplan, Cwmnt Development: The Fifty-Third Session of the International Law Commission, 96 Am.J. Int’l L. 412, 417 (2002). One scholar has noted that “[a]s long as the local remedies rule exists, controversy will remain as to the question of its conceptual nature, i.e. the question whether the rule forms a part of procedural law or whether it operates as a part of substantive law.” Karl Doehring, Exhaustion of Local Remedies, in 3 Enoy-CLOPEDIA Of PUBLIC INTERNATIONAL LAW 238, 240 (Rudolf L. Bindschelder et a!., eds., 1997). Codifications of the rule have largely avoided the question. See United Nations Int’l Law Comm’n, Second Report on Diplomatic Protection, ¶ 35, UN Doc. A/CN.4/514/ (February 28, 2001) (prepared by John Dugard); see also Bradford K. Gathright, Comment, Step in the Wrong Direction: The Loewen Finality Requirement and the Local Remedies Rule in NAFTA Chapter Eleven, 54 Emory L.J. 1093, 1124 (2005) (noting that disagreement about the rule’s status prompted delegates to the 1930 Hague Codification Conference to “le[ave] the answer intentionally ambiguous”).
*1234 There appear to be three schools of thought. The first contends that the rule “applies necessarily, and primarily, to the determination of the existence of an internationally wrongful act arising through the breach of an international obligation, and thus to the genesis of international responsibility.” United Nations Int’l Law Comm’n, Sixth Report on State Responsa-bility, ¶ 52, UN Doc. UN Doc. A/CN.4/302 (April 15, June 7, and July 14 1977) (prepared by Roberto Ago). Thus, “there is no international injury ... until the alien has exhausted his local remedies if available.” Edwin M. Borchard, Theoretical Aspects of the International Responsibility of States, 1 ZeitsohRift für Auslándisches Óffentliches Reoht und VolkeRRECHt 235, 237 (1929) (emphasis in original); see also Mexican Union Railway (UK v. Mexico), 5 R.I.A.A. 115, 122 (1926) (“It is one of the recognized rules of international law that the responsibility of the State under international law can only commence when the persons concerned have availed themselves of all remedies open to them under the national laws of the State in question.”); Second Repori on Diplomatic Protection, supra, at ¶ 55 (noting one scholar’s position that “the exhaustion of remedies rule is a ‘presupposition’ for unlawfulness”) (quoting Giorgio Gaja, L’Esaurimento dei Ricorsi Interni Nel Dirritto Internationale (1967)); D.P. O’Connell, 2 International Law 1053 (2d ed.1970) (noting that the rule is sometimes explained “on the theory that until municipal remedies have been exhausted there has been no breach of international law in relation to the treatment of individuals” and “the injury is not complete until the avenue [of local remedies] has been explored in vain”). In a widely cited decision, the Admiralty Transport Arbitration Board recognized that “the international breach does not come into existence until the private claim is rejected by the highest competent municipal court,” and, accordingly, “the recourse to that court is a matter of substance and not of procedure.” Claim of Finnish Shipowners (Finland v. Great Britain), 3 R.I.A.A. 1479 (1934). Under this view, exhaustion of remedies is not
a condition of international jurisdiction, but rather a rule of substantive law. While the State of which the claimant is a national may at any time protest concerning the treatment being accorded to its nationals, while it may institute a proceeding, if a competent tribunal exists, for the purpose of establishing that certain treatment is required by international law, it will lack a basis for presenting and prosecuting the particular claim of its national so long as adequate remedies are available to him under the law of the respondent State.
J.E.S. Fawcett, The Exhaustion of Local Remedies: Substance or Procedure?, 31 Brit. Y.B. Int’l L. 452, 452-53 (1954) (quoting Manley O. Hudson, International Tribunals: Past and Future 189 (1944)). As Judge Hudson of the International Court of Justice expressed it, the local remedies rule “is not a rule of procedure. It is not merely a matter of orderly conduct. It is part of the substantive law as to international, i.e., State-to-State responsibility.” Panevezys-Saldutiskis Railway (Estonia v. Lithuania), 1939 P.C.I.J. (ser.A/B) No. 76, at 47 (Hudson, J., dissenting).
The second school of thought holds that failure to exhaust remedies is simply a procedural bar to an international law claim. See Maj. op. at 1219-20 and sources cited therein. According to this approach, international responsibility begins with the wrongful act; “the initial action of a State organ already represents the unlawfulness.” Doehring, supra at 240.
A third camp maintains that the question turns on the facts of each case. “The *1235 problem with defining the local remedies rule generally as either procedural or substantive is that because the rule applies broadly to many forms of state responsibility, it serves more than one function.” Gathright, supra, at 1125. “Legal opinion is unanimous on this last point: the rule implies a suspensive condition, which may be procedural or substantive, but to which the right to bring international claims is subordinated.” Int’l Law Comm’n, First Report on Diplomatic Protection, ¶ 173, UN Doc. A/ CN.4/96 (January 20, 1956) (prepared by F.V. Garcia Amador); See also Fawcett, supra; Brownlie, supra, at 497. The United States State Department has weighed in with the third camp, explaining the division this way:
Under existing international law where the initial act or wrong of which complaint is made is not imputable to the State, the exhaustion of local remedies is required with a resultant denial of justice on the part of the State in order to impute any responsibility to the State. In this view, the exhaustion of remedies rule is a substantive rule, i.e., it is required from a substantive standpoint under international law in order to impute responsibility to a State.
On the other hand, where the initial act or wrong of which complaint it made is imputable to the State, substantively it is unnecessary to exhaust local remedies in order to impute responsibility to the State.... “[T]he rule of exhaustion of local remedies in such circumstance is procedural....”
Accordingly, the rule of exhaustion of local remedies may be substantive in certain types of cases and procedural in others.
Memorandum from Marjorie M. White-man, Assistant Legal Adviser, Department of State, to International Law Commission (December 18, 1956), Dec. 18, 1956, quoted in M.M. Whiteman, 8 Digest op International Law 789-90 (1967).[10]
Whether procedural or substantive, exhaustion is a well-established part of the law of nations and ignoring it contravenes those norms. If it is purely substantive, then it is unambiguously required by ATCA. If it is purely procedural, however, it is less clear that it is included in the Supreme Court’s mandate that we “recognize private causes of action for certain torts in violation of the law of nations.” Sosa, 542 U.S. at 724, 124 S.Ct. 2739.[11] *1236 There is no resolution to this debate. We cannot say with certainty whether exhaustion is a substantive or a procedural requirement. But we can say that it certainly qualifies as “a norm of international character” and is “defined with specificity” comparable to the classical causes of action. Sosa, 542 U.S. at 725, 124 S.Ct. 2739. Exhaustion is widely-accepted and well-defined, and it is an integral part of almost every claim in international law.
As the majority correctly points out, the local remedies rule was not developed for the use of domestic courts like those who administer ATCA- — it grew out of diplomatic protection in state-to-state disputes and now serves international tribunals. Nothing in Sosa or ATCA indicates that this distinction matters. No part of the “law of nations” was developed to serve ATCA; ATCA was written in order to bring the law of nations into American courts. The statute presupposes some difficulty in accommodating the ever-changing law of nations in a domestic context. We cannot reject aspects of the law of nations simply because they are not native to domestic courts.
In sum, such a fundamental tenet of international law deserves recognition in U.S. courts bound to apply the law of nations under ATCA. As the Court observed over a hundred years ago:
International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research and experience have made themselves peculiarly well acquainted with the subjects of which they treat.
The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); see also Restatement (Third) of the FoReign Relations Law of the United States, pt. I, ch. 1 (introductory note) (“International law is law like other law, promoting order, guiding, restraining, regulating behavior.... It is part of the law of the United States, respected by Presidents and Congresses, and by the States, and given effect by the courts.”). As Judge Cudahy has observed,
Certainly in applying a statute like the ATCA, where liability is predicated on ‘violation of the law of nations,’ it would seem natural to honor the basic tenets of public international law. It is also well-established that, as a general proposition, U.S. law should incorporate and comport with international law where appropriate.
Enahoro, 408 F.3d at 890 n. 6 (Cudahy, J., dissenting).
C
The exhaustion requirement is not only well accepted in international law, but it is well defined. The Commission of Arbitration has recognized it as the defendant’s “right to resist such an action if the persons alleged to have been injured have not first exhausted all the remedies available to them under the municipal law [and] the right to demand that full advantage shall have been taken of all local remedies.” Ambatielos Claim (Greece v. United Kingdom), 12 R.I.A.A. 83, 118-19, 23 I.L.R. 306, 334 (1956). Likewise, exceptions to the exhaustion requirement, similar to *1237 those in our domestic law, are well-defined and specific. The Restatement explains that exhaustion is waived where remedies are unavailable or where “it would be futile” to pursue them. Restatement (Third) Of The FoReign Relations Law Of The United States § 703 comment d (1987). The rule is flexible; it “is not a purely technical or right rule. It is a rule which international tribunals have applied with a considerable degree of elasticity. In particular, they have refused to act upon it in cases in which there are, in fact, no effective remedies owing to the law of the State concerned or the conditions prevailing in it.” Case of Certain Norwegian Loans (France v. Norway), 1957 I.C.J. 9, 39 (July 6) (Lauterpacht, J., concurring and dissenting). The International Covenant on Civil and Political Rights provides that exhaustion is not required when remedies come only after “undue delay,” and the same exception has been recognized by the American Convention on Human Rights, which excuses exhaustion in cases of “unwarranted delay in rendering final judgment.” United Nations International Covenant on Civil and Political Rights art. 14, Dec. 16, 1966, 999 U.N.T.S. 171; see also Organization of American States, American Convention of Human Rights, Nov. 4, 1950, art. 46(2), O.A.S.T.S. No. 36, 1144 U.N.T.S. 123; Paula Rivka Schochet, Note, A Neio Role for an Old Rule: Local Remedies and Expanding Human Rights Jurisdiction Under the Torture Victim Protection Act, 19 Colum. Hum. Rts. L. Rev. 23 (1987) (discussing exhaustion provisions in various multinational agreements).
U.S. law recognizes similar exceptions to exhaustion. TVPA requires that “[a] court shall decline to hear a claim ... if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred.” 28 U.S.C. § 1350 note, § (2)(b) (emphasis added). Legislative history for TVPA suggests that it was understood that TVPA’s exhaustion requirement would be excused where it would be excused in an international tribunal, including “when foreign remedies are unobtainable, ineffective, inadequate, or obviously futile.” S. Rep. No. 102-249, pt. 4, at 10 (1991). According to the Judiciary Committee, exhaustion is not difficult to show. “[I]n most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.” Id. at 9-10. The Judiciary Committee anticipated that the courts “will have to undertake a case-by-case approach” to determine when exhaustion is excused, and suggested courts consider “unfairness of the judicial system, unfair procedures, and lack of competence.” Id. Although the inquiry is complex, legislators were confident that the principle could be applied by courts as it was “generally consistent with common-law principles of exhaustion as applied by courts in the United States.” Id.[12]
*1238 IV
Even if exhaustion were not well developed in international law, we should recognize exhaustion as a prudential principle required by our domestic law, and we should recognize it for the same reasons that we require exhaustion of state, tribal and administrative remedies. It has been said that “in this area [of local remedies] particularly international law is essentially a law regulating or attempting to regulate the practice and relationships inter se of national administrations, their officials, agents and proteges, a highly specialized kind of administrative law.” Mummery, supra, at 393. Accordingly, the rule “has definite kinship with rules of exhaustion of remedies and primacy of jurisdiction in other areas of the law of administrative organization, namely, domestic administrative law.” Id. It is appropriate that we require exhaustion here, where our proceedings would result in a premature and unjustified interference in the resolution of a foreign conflict. Moreover, it will promote our own position within a government of separated powers.
A
As I discussed in Part I, there are three general reasons offered to justify prudential exhaustion. First, requiring exhaustion demonstrates respect for the courts of a separate sovereign or the administrative agencies of a coordinate branch of government. Second, exhaustion permits such courts or agencies to apply their own expertise to the matters in question, and allows the sovereign or branch to correct any errors in its own procedures before the federal courts assume jurisdiction. Third, even if the matter ultimately finds its way into our courts, exhaustion frequently requires the parties to refine their issues and develop the record in a way that will aid decision in U.S. courts.
First, requiring exhaustion of local remedies will promote respect for foreign tribunals or other processes for dispute resolution, such as commissions or political accords.[13] “ ‘Comity,’ in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation.” Hilton v. Guyot, 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Exhaustion of local remedies is not the same as comity in this sense: Exhaustion does not require recognition of the acts of another nation because there are no such acts to recognize. Thus, exhaustion comes before comity, while sharing its purposes. Exhaustion recognizes the possibility of legislative, executive or judicial acts in another nation; it thus respects the processes by which another nation has constituted itself and is worthy to be considered part of the community of nations.
Litigation of foreign claims in American courts may undermine local governments, who may be seen as weak or unresponsive when they were given no opportunity to address the problem in the first instance.[14] *1239 Taking up cases that can be handled domestically aggravates diplomatic and local tensions because it interferes with local control and stirs up unnecessaiy publicity. See Steven W. Yale-Loehr, Note, The Exhaustion of Local Remedies Rule and Fo-nmi Non Conveniens in International Litigation in U.S. Counts, 13 Cornell Int’l L.J. 351, 358 (1980). By use of domestic remedies “the intervention of outsiders is avoided (it is noteworthy that any intervention, no matter how skillful and tactful, is invariably disliked as such); and it is possible to avoid the publication of the dispute to the world at large, which often causes exacerbation.” Mummery, supra, at 391. The local remedies rule “functions similarly to the principles of comity, avoiding friction between states by permitting peaceful settlement before conflicts erupt.” Nsongurua J. Udombana, So Far, So Fair: The Local Remedies Rule in the Jurisprudence of the African Commission on Human and Peoples’ Rights, 97 A M.J. Int’l L. 1, 1 (2003). The rule that “a State should be given the opportunity to redress an alleged wrong within the framework of its own domestic legal system before its international responsibility can be called into question,” A.A. Canqado Trindade, The AppliCation of the Rule of Exhaustion of Local Remedies in International Law 1 (1983), helps to guard the sovereign against “excessive infringement by state to state claims on behalf of private individuals,” see Udombana, supra, at 2 (quoting Jost Delbruck, The Exhaustion of Local Remedies Rule and the International Protection of Human Rights: A Plea for a Contextual Approach, in Des Menschen Recht ZwiSCHEN FREIHEIT und Verantwor-tung 213, 217 (Jurgen Jekewitz et al. eds., 1989)). Exhaustion of remedies helps to maintain sovereignty within the international system because
the local remedies rule is really a conflict rule. It is, when properly constructed, a rule for resolving conflicts of jurisdiction between international law and municipal tribunals and authorities; the rule determines when and in what circumstances the local courts, on the one hand, and international tribunals, on the other, must or may assume jurisdiction over the issue.
Fawcett, supra, at 454.
An exhaustion rule “is conducive to good order in that it demarcates the line between the jurisdiction of the national and the international tribunal.” Mummery, supra, at 390. A lawsuit in U.S. courts will rarely be the best way to resolve supranational conflicts. As Judge Bork explained in Tel-Oren, “Diplomacy demands great flexibility and focuses primarily on the future rather than on the past, often requiring states to refrain, for the sake of their future relations, from pronouncing judgment on past conduct.” 726 F.2d at 818 (Bork, J., concurring); see also id. (“International law, unlike municipal law (at least in the United States), is not widely regarded as a tool of first or frequent resort and as the last word in the legitimate resolution of conflicts.”).
By accepting jurisdiction over foreign suits that can be appropriately handled locally, the federal courts embroil the nation in a kind of judicial “imperialism” that suggests the United States does not re *1240 spect or recognize a foreign government’s ability to administer justice. See Elliot J. Schrage, Judging Corporate Accountability in the Global Economy, 42 Colum. J. TRANSNAt’l L. 153, 176 (2003). As one commentator has observed,
the local remedies rule reconciles national autonomy with international co-operation in the sense that each state accepts, in broad lines, the judicial remedies provided by other states, and yet this acceptance does not deny the importance of proper international settlement of a dispute and the international standard of justice.
Yale-Loehr, supra, at 358 (citing Castor H.P. Law, The Looal Remedies Rule in INTERNATIONAL LAW 19 (1961)).
Second, exhaustion of remedies gives other countries the opportunity to address their own conflicts and craft their own solutions. In the domestic context, the doctrine “acknowledges the commonsense notion of dispute resolution that an agency ought to have an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.” McCarthy, 503 U.S. at 145, 112 S.Ct. 1081; see also Zara, 383 F.3d at 931 (“The policy underlying the exhaustion requirement is to give an administrative agency the opportunity to resolve a controversy or correct its own errors before judicial intervention.”). The principle in international practice is “not to submit [the claimant] to a mere judicial exercise,” but is “intended to afford the territorial government an opportunity actually to repair the injury sustained.” Mummery, supra, at 402. The exhaustion rule is part of a concerted international effort to encourage countries to provide effective local remedies. See Trindade, supra, 28 Int’l & Comp. L.Q. at 755.
This consideration provides perhaps the most important practical consideration for the adoption of an exhaustion requirement in ATCA. If litigants are allowed to seek refuge in U.S. courts before pursuing available remedies at home, we will have facilitated parties — including politically-minded parties — who wish to circumvent the creation and refinement of local remedies.
The purpose of the requirement that a decision of a lower court be challenged through the judicial process before the State is responsible for a breach of international law constituted by judicial decision is to afford the State the opportunity of redressing through its legal system the inchoate breach of international law occasioned by the lower court decision.
Loewen Group, Inc. (Can.) v. United States, ICSID (W.Bank) ARB(AF)/98/3 (June 26, 2003), quoted in Andrea K. Bjorklund, Reconciling State Sovereignty and Investor Protection in Denial of Justice Claims, 45 Va. J. Int’l L. 809, 856 (2005); see also Interhandel, 1959 I.C.J. at 27; Certain Norwegian Loans, 1957 I.C.J. at 96. The exhaustion provision “can only be beneficial to the development of international law” and will “help[ ] to raise standards in the domestic administration of justice.” Trindade, supra, 28 Int’l & Comp. L.Q. at 756. As Congress recognized in debating the exhaustion requirements of TVPA, “[t]his requirement ensures that U.S. courts will not intrude into cases more appropriately handled by courts where the alleged [wrongs] occurred. It ... can be expected to encourage the development of meaningful remedies in other countries.” H.R. Rep. No. 102-367, pt. 3, at 5, reprinted in 1992 U.S.C.C.A.N. 84, 88-89.[15]
*1241 Moreover, litigation is not always the best vehicle for resolving difficult internal matters. Exhaustion may thus encourage creative political solutions beyond our ken. The exhaustion requirement “acknowledges that a sovereign is not only in the best position to succeed, particularly when acting within its own territory, but that a sovereign is also most familiar with the situation and best able to fashion a remedy appropriate to local circumstances.” Richard D. Glick, Environmental Justice in the United States: Implications of the International Covenant on Civil and Political Rights, 19 HaRV. Envt’l.L. Rev. 69, 99 (1995); see also Brownlie, supra, at 473 (noting that “the greater suitability and convenience of national courts as forums for the claims of individuals and corporations” is one of the “more persuasive practical considerations” for the rule).[16] Human rights violations, for example, might more appropriately be addressed with criminal sanctions, rather than civil remedies of TVPA. “[CJriminal prosecutions locate control over such actions in the hands of governments, rather than private citizens, thus avoiding diplomatic turmoil.” Beth Stephens, Translating Filartiga: A Comparative and International Law Analysis of Domestic Remedies For International Human Rights Violations, 27 Yale J. Int’l L. 1, 52 (2002). A criminal prosecution at home would help to publicize the violations locally and would help to develop and define applicable criminal laws. Id. One could argue that “civil actions trivialize human rights abuses, implying that the harms inflicted can be compensated through a simple monetary payment.” Id.[17]
*1242 Finally, in domestic administrative law, we require exhaustion because it promotes more accurate adjudication performed by experts “in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion.” Far E. Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Administrative exhaustion aids accuracy because it allows for the development of a more complete record. See Ruviwat, 701 F.2d at 845 (“[T]he requirement of exhaustion of remedies will aid judicial review by allowing the appropriate development of a factual record in an expert forum.... ”). Similarly, in cases arising under ATCA, local expertise and proximity to witnesses and physical evidence may foster more accurate fact-finding. “National courts, familiar with local conditions and possessing easy access to witnesses, can usually settle disputes more expeditiously and conveniently than international tribunals.” Yale-Loehr, supra, at 358. Even in a case where local remedies ultimately prove inadequate, exhaustion may serve to refine the claims.
B
Requiring exhaustion of local remedies will help to preserve our role in a government of separated powers. Strictly speaking, separation of powers principles do not require us to stay our jurisdiction while the parties exhaust their local remedies. But although the Constitution does not demand that we abstain, separation of powers principles should inform our prudential judgment concerning exhaustion. In many respects exhaustion resembles the doctrines of political question, comity, and act of state, all of which require respect for foreign governments and the political branches of our government and may insist that the courts decline jurisdiction in order to avoid interfering with sensitive foreign matters to which, if a U.S. response is required, the political branches must respond. See Maj. op. at 1203 (political question is a “function of the separation of powers”), 1208 (“The [act of state] doctrine reflects the concern that the judiciary ... may interfere with the executive’s conduct of American foreign policy.”), 1211 (“Under the international comity doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise jurisdiction that is otherwise properly asserted.”). As the Court explained with respect to the act-of-state doctrine:
We once viewed the doctrine as an expression of international law, resting upon the highest considerations of international comity and expediency. We have more recently described it, however, as a consequence of domestic separation of powers, reflecting the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs.
W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., 493 U.S. 400, 404, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990) (internal quotation marks omitted).
*1243 Between the President and Congress, the political branches possess the plenary power of the United States to prosecute our interests abroad “by diplomacy, or, if need be, by war.” United States v. Diekelman, 92 U.S. 520, 524, 23 L.Ed. 742 (1875); see United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936) (the President is “the sole organ of the federal government in the field of international relations”) (internal quotation marks omitted). “[T]he conduct of foreign relations is committed by the Constitution to the political departments of the Federal Government ... [and] the propriety of the exercise of that power is not open to judicial inquiry,” United States v. Pink, 315 U.S. 203, 222-23, 62 S.Ct. 552, 86 L.Ed. 796 (1942), because these are “decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility.” Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111, 68 S.Ct. 431, 92 L.Ed. 568 (1948).
Mere recitation that the political branches are the organs of foreign policy does not resolve the separation of powers conundrum, however. Since the adoption of ATCA in Judiciary Act of 1789, we have been charged with providing a forum for aliens who have suffered injuries in violation of the law of nations. Deciding whether or not the exercise of jurisdiction will actually interfere with our foreign relations has been decided on a case-by-case basis, as the majority (and the district court before us) has done here. We may or may not be aided by the political branches in deciding whether to exercise jurisdiction, and we may or may not accede to requests from those branches. See Sosa, 542 U.S. at 733, 124 S.Ct. 2739; Alperin v. Vatican Bank, 410 F.3d 532, 555-57 (9th Cir.2005). But there can be little question since ATCA was revived in Filartiga that many actions that are brought under ATCA involve sensitive inquiries into the internal affairs of other countries. See Sosa, 542 U.S. at 733, 124 S.Ct. 2739 (noting pending cases which the government of South Africa claims interfere with its domestic policy); Mujica v. Occidental Petroleum Corp., 381 F.Supp.2d 1164 (C.D.Cal.2005) (dismissing, on political question grounds, ATCA claims alleging that the Columbian government worked with defendants to bomb plaintiffs’ home town).
Without an exhaustion requirement, courts must depend on statements from the executive — based on its own factfind-ing and expertise — to decide whether we should exercise jurisdiction under ATCA. Where the U.S. State Department has weighed in, “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy.” Sosa, 542 U.S. at 733 n. 21, 124 S.Ct. 2739. This is problematic because it is the judiciary, and not the executive, which has the responsibility to interpret ATCA. See generally Curtis A. Bradley, Chevron Deference and Foreign Affairs, 86 Va. L. Rev. 649, 680 (2000) (“The executive branch, however, is not charged with administering the [ATCA], Rather, the statute is a direct congressional regulation of federal court jurisdiction. As a result, there is no basis in the statute for presuming a delegation of lawmaking power to the executive branch.”). This allows the executive to cast a case-by-case vote on an issue uniquely reserved to the court: the question of its own subject matter jurisdiction. Justice Powell commented on just how much confusion can result from this executive encroachment on justiciability. “I would be uncomfortable with a doctrine which would require the judiciary to receive the Executive’s permission before invoking its jurisdiction.... Such a notion, in the name of the doctrine of separation of powers, seems to me to conflict with *1244 that very doctrine.” First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 773, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (Powell, J., concurring in the judgment); see id. (Douglas, J., concurring in the judgment) (worrying that executive interference would lead to arbitrary results as “the Court becomes a mere errand boy for the Executive Branch which may choose to pick some people’s chestnuts from the fire, but not others’ ”). “Resolution of so fundamental [an] issue [as the basic division of functions between the Executive and the Judicial Branches],” Justice Brennan argued, “cannot vary from day to day with the shifting winds at the State Department. Today, we are told, [judicial review of a foreign act of state] does not conflict with the national interest. Tomorrow it may.” Id. at 792-93, 92 S.Ct. 1808 (alterations in original) (Brennan, J., dissenting) (quoting Zschernig v. Miller, 389 U.S. 429, 443, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968) (Stewart, J., concurring)).
We have known such “shifting winds.” In In re Estate of Marcos Human Rights Litigation, we faced the problem squarely:
the Department of Justice has changed its position on whether a plaintiff such as Trajano has a cause of action cognizable in federal court for a violation of international law condemning torture .... We do not read the executive branch’s flip on this issue as signifying so much; its change of position in different cases and by different administrations is not a definitive statement by which we are bound on the limits of § 1350.
978 F.2d 493, 498-500 (9th Cir.1992), cert. denied, 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993). More recently, we faced similar difficulties in the Unocal litigation. See Doe I v. Unocal, 395 F.3d 932 (9th Cir.2002), rehearing en banc granted, 395 F.3d 978 (9th Cir.2003). While the Clinton administration informed the court that the litigation would have no effect on U.S. foreign policy, the Bush administration claimed that it would. See Beth Stephens, Sosa v. Alvarez-Machain: “The Door Is Still Ajar” For Human Rights Litigation in U.S. Courts, 70 Brooklyn L. Rev. 533, 560-67 (2004). The point is not that the executive is unstable, or that our foreign policy shifts with every political wind, but that foreign relations is a notoriously fluid matter, subject to subtle changes in personnel, events, and perceptions on either side of our borders. Conduct of our foreign relations requires constant monitoring and adjustment.
As courts, we are not well situated to make such subtle adjustments in response to national and world events. We are, by design, insulated from ordinary political pressures. We rely on the parties to supply us the facts on which we base our decisions and have no means for gathering information essential to such decisions. See Curtiss-Wright, 299 U.S. at 320, 57 S.Ct. 216 (pointing out that as between Congress and the President, the President “has the better opportunity of knowing the conditions which prevail in foreign countries”). Actions brought under ATCA must necessarily involve reparations for past actions, not injunctive or other equitable relief for which we have no mechanism for enforcement outside our borders. Our tools for mediating disputes occurring outside of the physical boundaries of our jurisdiction are quite limited, and our remedies largely inadequate to reconcile political differences among the parties. “[I]nternational legal disputes are not as separable from politics as are domestic legal disputes,” Justice Powell observed. First Nat’l City Bank, 406 U.S. at 775, 92 S.Ct. 1808 (Powell, J., concurring in the judgment). The Sosa Court thus recognized the principle of maintaining a “high bar” for international law claims, because the “potential implications for the foreign *1245 relations of the United States of recognizing such causes should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.” Sosa, 542 U.S. at 727, 124 S.Ct. 2739.
Exhaustion will not prevent these problems. But by requiring parties to assure the court that they have pursued their local remedies before coming to our courts, exhaustion may sharpen the issues for us and for the executive and Congress; just as exhaustion may develop the record and aid our processes, it may likewise focus the political branches’s vision as well. Where the litigant has never approached either a foreign or his own state through its courts or other processes, he cannot expect to receive local executive representation needed to bring about a diplomatic resolution. By short-circuiting his own system and going straight to foreign courts, the litigant deprives his home government of discretion in selecting a means to resolve the dispute. See RestatemeNt (ThiRd) of THE FOREIGN RELATIONS LAW OF THE UNITED States § 206 comment c (noting that sovereignty entitles states to apply law within their borders, and that it entitles states to choose to “pursue legal remedies for injury” including “the right to make diplomatic claims and to resort to arbitral of judicial tribunals.”). Without an exhaustion rule, individual litigants can single-handedly derail diplomacy, forcing us to mediate an international dispute through a lawsuit for damages. International law has long recognized that exhaustion enables governments to protect themselves from the demands of individual litigants who seek to use international law to settle disputes better handled at home. The rule spares states “the intricate and possibly expensive and embarrassing business of sponsoring on the international plane the claims of its nationals which can be or could have been settled by less cumbersome machinery” and it allows government officials to protect national interests in using diplomacy because it affords them “closer control over relations with the foreign state concerned.” Mummery, supra, at 392-93.
C
The dispute before us is a textbook case for exhaustion. The record is replete with contradictory warnings, misdirection, and diplomatic speak. We have conflicting statements from the government of PNG, the latest following a change in the administration. The most recent communique (unauthenticated) advises us that PNG’s relations with the United States will be adversely affected unless we accept jurisdiction of this case. PNG’s near-threat may itself represent a political judgment rather than a jurisdictional fact, reflecting the new government’s interest in having someone else solve its internal problems. We have a cryptic Statement of Interest from the State Department, suggesting that the United States probably has a problem with our exercising jurisdiction— but it may not. When the district court asked for clarification, the State Department responded that it stood by its prior ambiguous statement. The parties have no evident connection to the United States. The plaintiffs-Bougainvilleans are largely PNG residents; the defendant is a multinational corporation, apparently out of Great Britain but with strong ties to Australia. The issues are complex and will require mustering facts that are anywhere from ten to forty years old and likely ascertainable only in PNG, thousands of miles from the Central District of California, where the complaint was filed. Although the defendant is a private corporation, the complaint alleges the complicity of a prior PNG government, actions by the PNG armed forces, and a history of internal ethnic and political strife.
*1246 Even from our limited vantage point, it is far from clear that sending these parties home to pursue their local remedies first will solve this matter without our mediation. But is well worth the effort. If it does not succeed, the plaintiffs may renew their action in our courts and, judging from our experience with domestic exhaustion, in the long run we will all be better off for it.
V
I would affirm the judgment of the district court dismissing this suit, but I would do so without prejudice to refiling the suit after the plaintiffs have exhausted their local remedies. I would thus not reach any of the issues addressed by the majority because I regard them as premature, and I express no opinion on the majority’s resolution of those questions.
I respectfully dissent.

. This is a case of first impression in this circuit. We have not addressed the application of Sosa to exhaustion. The only issue before us in Alperin v. Vatican Bank, 410 F.3d 532 (9th Cir.2005), cited by the majority at 1213-14, was whether that case should be dismissed under the political question doctrine. See id. at 538, 541 n. 4 (“by agreement of the parties the district court limited its discussion to the issue of whether the Holocaust Survivors’ claims should be dismissed under the political question doctrine,” and the "viability of the Holocaust Survivors' claims apart from the issue of the political question doctrine is not before us”). We left open the possibility of other grounds for dismissal, and opined that "[gjiven ... a myriad of other procedural and jurisdictional hurdles, the Holocaust Survivors may indeed face *1225 an uphill battle in pursuing their claims.” Id. at 539.

. Statutorily required exhaustion, by contrast, may be jurisdictional. See Weinberger v. Salfi, 422 U.S. 749, 764-67, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); Marathon Oil Co. v. United States, 807 F.2d 759, 768 (9th Cir.1986); Montgomery v. Rumsfeld, 572 F.2d 250, 252 (9th Cir.1978).

. In its entirety, ATCA provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.” 28 U.S.C. § 1350.

. The majority responds that remedies for torture are only narrowed if aliens can no longer bring a claim for torture under ATCA. Maj. op. at 1216 n. 26. The Seventh Circuit has so held. Enahoro, 408 F.3d at 884-85, 886 (holding that torture claims are precluded now that TVPA "occup[ies] the field" and finding it “hard to imagine that the Sosa Court would approve of common law claims based on torture and extrajudicial killing when Congress has specifically provided a cause of action for those violations and has set out how those claims must proceed"). My point is a little different: If the majority is correct, Congress has made it more difficult for aliens to bring torture claims into U.S. courts because now (under TVPA) they must first exhaust their remedies, whereas previously (under ATCA) they did not.

. I can only speculate as to why Congress chose not to clarify ATCA when it drafted the exhaustion provisions of TVPA. It may be that because TVPA extended the cause of action to United States citizens, Congress wished to make clear that traditional exhaustion would also apply to citizens suing in their own national courts.

. Judge Cudahy ultimately concluded that Sosa offered “little guidance” on the question and that is was "far from clear” whether exhaustion was required under ATCA. 408 F.3d at 890 (Cudahy, J., dissenting).

. The majority argues that because Sosa urges caution in expanding the causes of action available under ATCA, judicial caution precludes recognition of exhaustion. Maj. op. at 1219 (citing Sosa’s directive that "[tjhese reasons argue for great caution in adapting the law of nations to private rights”). This turns the Court’s reasoning on its head; the majority’s conception of caution would expand, rather that restrict, the availability of claims under ATCA. It overlooks the Court’s "reasons” for caution, which include the fear that courts might "consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens,” and "raise risks of adverse foreign policy consequences.” 542 U.S. at 727, 728, 124 S.Ct. 2739. An exhaustion requirement would help abate such fears and would serve to fortify the "high bar” Sosa established for ATCA claims. Id. at 727, 124 S.Ct. 2739.

. The exhaustion requirement predates both the Jay Treaty and ATCA. "The requirement that local remedies should be resorted to seems to have been recognized in the early history of Europe, before the modern national state had been born....” Amerasinghe, supra, at 22; see also A.A. CanQado Trindade, The Application Of The Rule Of Exhaustion Of Local Remedies In International Law 1 (1983); A.A. CanQado Trindade, Origin and Historical Development of the Rule of Exhaustion of Local Remedies in International Law, 12 Revue Belge De Droit International 499, 507, 512 (1976) (noting that "the practice of States throughout the eighteenth century was clearly directed towards upholding the local remedies rule”). For reasons that I explain, infra, it reads too much into ATCA to assume that because the Senate and the President approved the Jay Treaty with an express exhaustion requirement, the House and Senate, five years earlier, could not have anticipated an exhaustion requirement in ATCA. But see Maj. op. at 1215 ("the explicit exhaustion requirement in the Jay Treaty may reveal that the First Congress did not view exhaustion as an automatic rule of customary international law”).

. Like its U.S. domestic counterpart, the rule of exhaustion of local remedies is largely judge-made. "[Pjerhaps more so than any other rule of international law,” it "undoubtedly grew up under the nurturing of professional administrators.” Mummery, supra, at 393. The law continues to be "sheltered from the harsher political winds” that shape much of international law because its development rests in the hands of judges. Id.

. The matter is by no means resolved. There was a trend towards the procedural view at the time of Phosphates in Morocco (Italy v. Fr.), 1938 P.C.IJ. (ser.A/B) No. 74, but the International Law Commission adopted the substantive view in the 1970s. See Maj. op. at 1220; Second Report on Diplomatic Protection, supra ¶ 35-37. The International Law Commission's current draft articles currently stop short of declaring when international responsibility attaches, but declare that "The responsibility of a State may not be invoked if ... [t]he claim is one to which the rule of exhaustion of local remedies applies and any available and effective local remedy has not been exhausted." Responsibility of States for Internationally Wrongful Acts, Art. 44, 2001 in Official Records of the General Assembly, Fifty-sixth Session, Supplement No. 10 (A/56/10). The current Third Restatement takes no position on the issue; it has relinquished even the noncommittal stance of the Second Restatement, which declared that "the exhaustion of available remedies is primarily a procedural requirement.” Restatement (Second) of the Foreign Relations Law of the United States § 206 comment d (1965) (emphasis added).

. I believe that Sosa’s rule would incorporate even procedural exhaustion, because the international community does not recognize virtually any "violation of the law of nations” without it. Contrary to the majority’s opinion, the Sosa rule is not limited to “substantive norms comparable to 'violation of safe conducts, infringement of the rights of ambassadors, and piracy,’ ” Maj. op. at 1221 (quoting Sosa, 542 U.S. at 724, 124 S.Ct. 2739), but requires recognition of "any claim based on *1236 the present-day law of nations [that] rest[s] on a norm of international character accepted by the civilized world and defined with specificity comparable to the features of the 18th-century paradigms we have recognized.” Sosa, 542 U.S. at 725, 124 S.Ct. 2739.

. Judicial inquiry into available exceptions in ATCA cases would be similar to that performed when applying the doctrine of forum non conveniens, see Menendez Rodriguez v. Pan American Life Insurance Co., 311 F.2d 429, 433 (5th Cir.1962) (finding that political refugees could receive a fair hearing in Cuba), vacated on other grounds, 376 U.S. 779, 84 S.Ct. 1130, 12 L.Ed.2d 82 (1964), or considering the enforceability of a forum selection clause, see McDonnell Douglas Corp. v. Islamic Republic of Iran, 758 F.2d 341, 346 (8th Cir.1985) (refusing to consider enforcement of a forum selection clause where litigation in Iran would “be so gravely difficult and inconvenient that McDonnell Douglas would for all practicable purposes be deprived of its day in court”).

. I have deliberately refrained from referring to comity between federal courts and foreign courts, because I do not wish to prejudge what form local remedies might take. As I discuss infra, at 1241-42 n. 17, we have only to look at South Africa’s Truth and Reconciliation Commission to see that some countries may be able to craft unique institutions for dealing with difficult internal matters. Not every solution requires a judicial solution. Indeed, governments have much greater flexibility in terms of process and remedies than American courts may be able to offer.

. The majority observes that hearing exhausted cases presents the same potential for undermining local governments. Maj. op. at 1220 n. 31. While this is true, it misses the point. If we respect the international norm requiring exhaustion, we will minimize the number of cases that involve potential med *1239 dling in other country’s affairs. In fact, we will intervene only where governments are so inadequate as not to provide adequate remedies. With exhaustion, we get the best of both worlds. We retain a commitment to the principle of international comity, while stepping in to render justice where required— and only where required. While adjudicating the exhaustion requirement requires occasional inquiries into the internal affairs of other nations (in cases where the adequacy of remedies is not readily apparent), id., this infrequent inquiry is preferable to offering international intervention on behalf of every foreign plaintiff who shops a claim in American courts.

. The majority complains about the lack of “empirical data showing improvements in the quality or accessibility of local remedies as a result of the application of the local remedies rule.” Maj. op. at 1222. A study of this scope would indeed be difficult to complete— *1241 since cases like the one before us are rare. We need not obtain proof of the exhaustion's effectiveness beyond a reasonable doubt before considering scholars' arguments and case studies as part of our prudential inquiry. That said, there are convincing empirical examples, see infra, 1241-42 n. 17. These examples fall short of quantifying "the full effects of human rights treaties," Maj. op. at 1222, but they strongly indicate exhaustion helps foster local remedies, while preserving international litigation for those "individuals whose access to justice is blocked in their home country.” Ellen Lutz & Kathryn Sik-kink, The Justice Cascade: The Evolution and Impact of Human Right Trials in Latin America, 2 Chi. J. Int'i. L. 1, 4 (2001). And even if I believed that the academic empirical debate was a draw, I would defer to Congress's observation that exhaustion "can be expected to encourage the development of meaningful remedies in other countries.” H.R. Rep. No. 102-367, pt. 3, at 5, reprinted in 1992 U.S.C.C.A.N. 84, 88-89, and the State Department's decision, in the case of South Africa, that foreign litigation over reparations for apartheid interfered with that nation’s domestic development. See In re S. Afr. Apartheid Litig., 346 F.Supp.2d 538, 553 (S.D.N.Y.2004).

. Failure to exhaust threatens international institutions, not just local ones. Most claims brought under ATCA could have been brought in an international forum — one that most likely requires exhaustion. Allowing claims to be brought in United States courts before efforts at a local solution allows litigants to forum shop and discourages them from seeking adjudication in international bodies. See Curtis A. Bradley, The Costs of International Human Rights Litigation, 2 Chi. J. Int’l L. 457, 469 (2001) (arguing that alien tort actions are costly to the international system because they risk preempting or disrupting local remedies or international institutional responses).

. One trend we have seen in recent years is the development of creative, indigenous legal solutions to address alleged human rights violations.
[Tjhe transition from autocratic rule to democracy in numerous countries, beginning in South America but extending to Eastern Europe and parts of Africa, Central America, and Asia, has caused new governments to devise strategies for coming to terms with the human rights abuses of prior regimes and, in some case, guerrilla opposition groups. In most cases in which states have decided to seek accountability, they have charted their own course under domestic law, creating mechanisms tailored to their individual circumstances. This pattern has led to criminal trials, truth com *1242 missions, purging of former officials from office, and civil suits against abusers.
Steven R. Ratner, New Democracies, Old Atrocities: An Inquiry In International Law, 87 Geo. L.J. 707, 714 (1999). We can see evidence of these local solutions most prominently in South Africa, with the creation of the Truth and Reconciliation Commission to address the injustices of apartheid, see Schrage, supra, at 166, and most recently in Rwanda, with the development of an alternative dispute resolution method known as ga-caca courts, which emphasize the admission of guilt and expression of remorse by defendants complicit in the Rwandan genocide, see William A. Schabas, Genocide Trials and Ga-caca Courts, 3 J. Int'l Crim Just. 879 (2005).